## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

MURAKUSH CALIPHATE
OF AMEXEM INC.,                    )
d/b/a                             )
MURAKUSH IMPERIAL TEMPLE OF
AMEXEM,                           )          Civil Action No. 11-1317 (RBK)

             Plaintiff,    )

             v.            )          **OPINION**

STATE OF NEW JERSEY et al.,        )

           Defendants.    )

---

      This matter comes before this Court upon the Clerk's receipt of two groups of

submissions; both submissions were made on behalf of the same entity named as the plaintiff.

See Murakush Caliphates of Amexem v. State of New Jersey ("Instant Matter"), Civ. Action No.

11-1317, and Murakush Caliphate of Amexem Inc. v. Simandle ("Caliphate"), Civ. Action No.

11-1316 (MLC).  The Instant Matter was assigned to the undersigned.  The initial submissions

made in the Instant Matter consisted of six documents, see Instant Matter, Docket Entries Nos. 1,

1-1 to 1-4, and 2, with the document titled "Complaint" being the first in the package, see Docket

Entry No. 1; these submissions were followed by a letter and prepayment of a filing fee.  See

Docket Entry No. 3 and Docket Entry of May 12, 2011.  For the reasons expressed below: (a) the

Complaint will be dismissed; and (b) limited orders of preclusion will be entered against the

natural persons who executed the submissions in the Instant Matter and Caliphate, their

associates and juridical entities actually registered or fathomed by these persons.

I.    **BACKGROUND**

Since neither the content of the submissions at bar nor this Court's decision to issue

limited orders of preclusion could be duly appreciated without a careful discussion of

background of the Instant Matter and Caliphate, the Court finds it warranted to begin this

Opinion with an outline of pertinent umbrella issues and specific facts implicated in this case.

A.    **MOORISH AND REDEMPTIONIST MOVEMENTS**

Two concepts, which may or may not operate as interrelated, color the issues at hand.

One of these concepts underlies the ethnic/religious identification movement of certain groups of

individuals who refer to themselves as "Moors," while the other concept provides the basis for

another movement of certain groups of individuals, which frequently produces these individuals'

denouncement of United States citizenship, self-declaration of other, imaginary "citizenship" and

accompanying self-declaration of equally imaginary "diplomatic immunity."

1.    **Moorish Movement**

In 1998, the United States Court of Appeals for the Seventh Circuit – being one of the

first courts to detail the concept of Moorish movement, observed as follows:

> [The Moorish Science Temple of America is a] black Islamic sect . . . .
> [T]hree-fourths of its temples (congregations) are inside prisons.  The Moors, as
> adherents to the Moorish Science Temple are called, have their own version of the
> Koran and a list of prophets that includes, in addition to the prophets recognized
> by orthodox Islam, Buddha, Confucius, and the founder . . . of the Moorish
> Science Temple . . . .  Two groups vie for leadership of the sect: one in Mt.
> Clemens, Michigan, headed by [someone referred to as] Grand Sheik/Moderator
> Brother R. Love-El, and one in St. Louis headed by [someone referred to as]
> Grand Sheik Jerry Lewis-Bey. (The suffixes "El" and "Bey" refer to the African
> tribes from which the Moors believe black people are descended.)

Bey v. Lane, 863 F.2d 1308, 1309 (7th Cir. 1998).[1]

### 2.     "Redemptionism," "Paper Terrorism" and Related Concepts

Shortly after the concept of the Moorish movement was outlined by the Seventh Circuit,

discussions of another movement appeared on the pages of legal opinions issued by the federal

judiciary; that other movement was dubbed a "sovereign citizenship" movement.  This

movement was fostered by

> a loosely organized collection of groups and individuals who have adopted a
> right-wing anarchist ideology originating in the theories of a group called the
> Posse Comitatus in the 1970s.  Its adherents believe that virtually all existing
> government in the United States is illegitimate . . . . [Therefore, such] "sovereign
> citizens" wage war against the government and other forms of authority using
> "paper terrorism" harassment and intimidation tactics, and occasionally resorting
> to [physical] violence.

Sovereign Citizen Movement, Anti-Defamation League, at <<http://www.adl.org/Learn/ext_us/

SCM.asp?LEARN_Cat=Extremism&LEARN_SubCat=Extremism_in_America&xpicked=4&ite

m=sov>> (visited on Mar. 31, 2011).[2]

---

[1] The underlying term "Moors" seemingly reflects the adherents' interest in highlighting their actual or alleged "ancestry in ancient Moors, i.e., the seventeenth century Muslims of the Islamic Iberian Peninsula and North Africa, who were of Berber and Arab descent."  Marrakush Soc'y v. N.J. State Police, 2009 U.S. Dist. LEXIS 68057, at *4, n.1 (D.N.J. July 30, 2009).

[2] The concept of "sovereign citizenship" does, occasionally, relate to the phenomenon of "world passports."  "World passports," issued by the so-called World Service Authority ("WSA"), are not recognized, in the United States and in the majority of world nations, as substitutes to official documents, such as national passports or drivers' licenses.  See, e.g., Eugenio J. Huot Calderon, The Concept of Puerto Rican Citizenship, 35 Rev. D.P. 321, 333-36 (1996); <<http://web.archive.org/web/20080307015819/http://foia.state.gov/masterdocs/07fam/07m1310.pdf>>.  A former-World-War-II-bomber-pilot-turned-peace-activist Garry Davis created the WSA in 1953 after renouncing his U.S. citizenship and gaining notoriety by picketing the United Nations to argue that world peace requires a global government rather than a system of nation-states.  See Daniel Engber, What's a World Passport? Slate Mag. (Mar. 24, 2006).  The WSA has been promoting "world citizenship" by issuing documents largely similar in their appearance to regular national passports, which the WSA called "world passports," to any person

Consequently, a decade after the Seventh Circuit's issuance of <u>Bey v. Lane</u>, the United States Court of Appeals for the Third Circuit noted a stream of government actions aimed at controlling the "paper terrorism" activities of sovereign citizens, which – by then – matured into a wide-spread criminal scheme, where the scheme participants' "self-legitimized" their names for the purposes of initiating fraudulent legal transactions. The Court of Appeals explained:

> Evidently, [adherents of this scheme have been] filing [fraudulent] financing statements under Article 9 of the UCC, which sets forth a process for perfecting security interests in property.   These liens and judgments, accessible on financing statement forms, are easy to file.  Once registered, however, the fraudulent liens are very burdensome to remove.  For example, in a New Jersey incident, [one group] registered a fraudulent $ 14.5 million lien with the New Jersey Department of Revenue against a federal prosecutor and a $ 3.5 million lien against a federal judge for using [the group participants'] "copyrighted" names in court papers and hearings . . . .  [Adherents of this scheme] have filed these commercial liens with state departments of revenue, departments of state, or other the state agencies responsible for receiving and recording these financial instruments.  Further investigation revealed that various publications were advocating the exploitation of the UCC filing process and provided explicit instructions on how to perfect these fraudulent security interests, including sample financing statements forms. [These publications built on] the "Redemptionist" theory, which propounds that a person has a split personality: a real person and a fictional person called the

_____

who wanted to declare himself/herself "a citizen of the world." One can inexpensively obtain such "passport" by filling out an application form at the WSA website. See <<http://www.world government.org/>>.  Therefore, while some persons just denounce their United States citizenship under the claim of sovereign citizenship, <u>see</u>, <u>e.g.</u>, <u>Roche v. Attorney General</u>, 2011 U.S. App. LEXIS 5773, at 1-2, nn. 1 and 2 (3d Cir. Mar. 21, 2011), others accompany their denouncements of United States citizenship by applications for "world passports" and attempt to use these passports as legally cognizable documents, sometimes for the purposes of perpetrating criminal schemes in the United States.  <u>See</u>, <u>e.g.</u>, <u>Asghar v. State</u>, 698 N.E.2d 879 (Ind. Ct. App. 1998).  Moreover, a person's denouncement of his/her United States citizenship (being occasionally accompanied by the person's obtaining of a "world passport") frequently produces a peculiar "side effect" in the form of that person's self-grant of alternative, imaginary citizenship which, in turn, results in that person's insistence upon his/her "diplomatic immunity" for the purposes of United States law or, better say, for the purposes of the "grantee's" attempts to avoid the reach of law.  <u>See</u>, <u>e.g.</u>, <u>U.S. Dist. Court v. Ephriam</u>, 2009 U.S. Dist. LEXIS 103284 (D. Kan. Nov. 4, 2009).

"strawman." . . . Redemptionists claim that government has power only over the strawman and not over the live person, who remains free [and, thus,] individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman. Thereafter, [pursuant to this "theory,"] the real person can demand that government officials pay enormous sums of money to use the strawman's name or, in the case of prisoners, to keep him in custody.  If government officials refuse, [adherents of this scheme] file liens against [government officials] . Adherents of this scheme also advocate that [they] copyright their names to justify filing liens against officials using their names in public records such as indictments or court papers.

Monroe v. Beard, 536 F.3d 198, 203 and nn. 3 and 4 (3d Cir. 2008); accord Roche, 2011 U.S.

App. LEXIS 5773, at 2 (noting that the "sovereign citizen" litigant elected to present the

district court's dismissal of his petition as a "contract" between the court and the litigant).

The "strawman" concept is, occasionally, presented/exploited somewhat differently by

those redemptionists who claim that – at the moment of their (self-)denouncement of United

States citizenship and/or their accompanying self-grant of imaginary alternative citizenship –

their "strawman" incarnation became "deceased," and their live persons quasi-expatriated from

the U.S. (while continuing their actual physical residence in the United States).  In connection

with this quasi-deceased/expatriation scheme, such redemptionists claim that their live persons:

(a) hold "estates" in the form of actual physical bodies of their respective "quasi-deceased"

strawmen;[3] and (b) reside in geographic locales they "self-claimed away" from the United States

_____

[3]  This "estate" concept is legally deficient on its face.  As one court explained,

[such] "estates" of [litigants] cannot qualify as [actual] litigants since [these "estates"] offer no order by a probate court acknowledging the existence of these "estates" and, indeed, it would be surprising had such order been entered because it is well established that the body of a decedent cannot be an estate, or even a part of an estate.  See Greneker v. Sprouse, 263 S.C. 571, 574 (1975) (clarifying that the estate is limited to the real and personal property of a decedent); see also In re Estate of Medlen, 286 Ill. App. 3d 860, 864 (Ill. App. Ct. 1997) (explaining that "there is no property right in a dead body, and

to "self-declare" them territories of the ancient Sultanate of Morocco (or territories over which

the ancient Sultanate of Morocco should have control roughly similar to that of suzerainty).

### 3.  Interplay Between Moorish and Sovereign Citizenship Movements

It does not appear that one's Moorish ethnic roots (or Moorish religious convictions, or

both) have any reason to go hand-in-hand with one's adhesion to the sovereign citizenship

movement (or with one's professing the theory of redemptionism, or with one's practice of

"paper terrorism," claims of self- granted "diplomatic immunity," etc.).  However, and

unfortunately enough, certain groups of individuals began merging these concepts by building on

their alleged ancestry in ancient Moors (and/or on their alleged or actual adhesion to Moorish

religious convictions) for the purposes of committing criminal offenses and/or initiating frivolous

legal actions on the grounds of their self-granted "diplomatic immunity," which these individuals

deduce either from their self-granted "Moorish citizenship" and from their correspondingly-

produced homemade "Moorish" documents (or from correspondingly-obtained "world

passports") or from a multitude of other, equally non-cognizable under the law, bases, which

these individuals keep creating in order to support their allegations of "diplomatic immunity."[4]

---

the body forms no part of the decedent's estate . . ." and citing 22A Am. Jur. 2d Dead
Bodies §§ 2 and 3 and In re Estate of Fischer, 1 Ill. App. 2d 528, 535, 117 N.E.2d 855
(Ill. App. Ct. 1954)); In re Estate of Moyer, 577 P.2d 108, 110 (Utah 1978) (same);
Snyder v. Holy Cross Hospital, 30 Md. App. 317 (Md. App. Ct. 1976) (same).

Estate of Casimir v. New Jersey, 2009 U.S. Dist. LEXIS 78113, at *9 (D.N.J. Aug. 31, 2009).

[4]  Such claims of "diplomatic immunity" are without merit.  As it was already observed,

[Plaintiffs err in conflating their] expatriation and [diplomatic] immunity arguments,
since: (a) Plaintiffs seem to focus on an irrelevant fact that anyone may renounce his/her
United States citizenship, but this fact in no way establishes that Plaintiffs actually
expatriated in accordance with the applicable legal requirements, see, e.g., Memorandum

### B.     PRIOR "MARRAKUSH" LITIGATIONS IN THIS AND OTHER COURTS

#### 1.     Marrakush Society Cases and Other Courts' Actions Detected in 2009

During May, June and July of 2009, nineteen actions (hereinafter, collectively, "Marrakush Society Cases") were initiated in this District, all naming as the plaintiff – or implicating, directly or indirectly – a certain entity designated as the "Marrakush Society."  See Marrakush Society v. Township of Newfield, Civil Action No. 09-3591 (D.N.J.) (initiated on July 20, 2009); Marrakush Society v. Township of New Jersey State Police, Civil Action No. 09-3590 (D.N.J.) (initiated on July 20 2009); Marrakush Society v. Township of Vineland, Civil Action No. 09-3589 (D.N.J.) (initiated on July 20, 2009); Marrakush Society v. Township of Willingboro, Civil Action No. 09-3392 (D.N.J.) (initiated on July 10, 2009); El. v. Cox, Civil Action No. 09-3372 (D.N.J.) (initiated on July 10, 2009); El. v. Cox, Civil Action No. 09-3371 (D.N.J.) (initiated on July 6, 2009); Marrakush Society v. Township of Mount Laurel, Civil Action No. 09-3507 (D.N.J.) (initiated on June 5, 2009); Marrakush Society v. Superior Court of New Jersey, Civil Action No. 09-3506 (D.N.J.) (initiated on June 5, 2009); Marrakush Society v. Township of Mansfield, Civil Action No. 09-3505 (D.N.J.) (initiated on June 5, 2009); Marrakush Society v. Burlington County Jail, Civil Action No. 09-3504 (D.N.J.) (initiated on June 5, 2009); Marrakush Society v. Township of Willingboro, Civil Action No. 09-3503

---

Opinion for the Solicitor General of June 12, 2000, . . . ; Marks v. Esperdy, 315 F.2d 673 (2d Cir. 1963) . . . ; and (b) even if the Court were to hypothesize that Plaintiffs duly expatriated, the fact of expatriation has no effect on the state court's jurisdiction to conduct Plaintiffs' criminal proceedings.  See, e.g., Cohen v. Little Six, Inc., 543 N.W.2d 376 (Minn. Ct. App. 1996); see also Cara S. O'Driscoll, The Execution of Foreign Nationals in Arizona, 32 Ariz. St. L.J. 323 (2000); [accord] Casanova v. Fitzpatrick, 214 F. Supp. 425 (S.D.N.Y. 1963) . . . .

Casimir, 2009 U.S. Dist. LEXIS 78113, at *19, n. 8 (parenthetical explanations omitted).

(D.N.J.) (initiated on June 5, 2009); Marrakush Society v. Township of Pennsville, Civil Action

No. 09-3502 (D.N.J.) (initiated on June 5, 2009); Marrakush Society v. Township of

Westampton, Civil Action No. 09-3442 (D.N.J.) (initiated on June 5, 2009); Marrakush Society

v. Township of Westampton, Civil Action No. 09-3441 (D.N.J.) (initiated on July 5, 2009);

Marrakush Society v. Township of Willingboro, Civil Action No. 09-2522 (D.N.J.) (initiated on

May 22, 2009); Marrakush Society v. Township of Westampton, Civil Action No. 09-2521

(D.N.J.) (initiated on May 22, 2009); Marrakush Society v. Township of Mount Laurel, Civil

Action No. 09-2520 (D.N.J.) (initiated on May 22, 2009); Marrakush Society v. Township of

Pennsville, Civil Action No. 09-2519 (D.N.J.) (initiated on May 22, 2009); and Marrakush

Society v. New Jersey State Police, Civil Action No. 09-2518 (D.N.J.) (initiated on May 22,

2009).  The Marrakush Society Cases were assigned to Judge Jerome B. Simandle ("Judge

Simandle").  Accord Local Civ. R. 40.1(c) (directing assignment of related cases to the same

judge in order to prevent undue judge-shopping by proliferating litigants).  Two actions among

the Marrakush Society Cases were styled as habeas matters, while the remaining seventeen were

purporting to present civil rights litigation.

Commencement of the Marrakush Society Cases in this District coincided, time-wise,

with initiation of analogous matters in the United States District Courts for the Southern District

of Florida, Eastern District of New York, District of Delaware and, perhaps, other district courts.

See, e.g., Aboriginal Law Firm v. Bock (Florida Action - I"), Civil Action No. 09-80067

(DTKH) (S.D. Fla.), (initiated on January 20, 2009); El v. State of Delaware ("Delaware

Action"), Civil Action No. 09-00144 (SLR) (D. Del.) (initiated on March 5, 2009); Marrakush

Society v. City of Hollywood, Inc. ("Florida Action - II "), Civil Action No. 09-60828 (ASG)

(S.D. Fla.) (initiated on June 3, 2009); <u>Marrakush Society v. Broward Sheriff's Office</u> ("<u>Florida</u>

<u>Action - III</u>"), Civil Action No. 09-60829 (ASG) (S.D. Fla.) (initiated on June 3, 2009);

<u>Inter-Continental Aboriginal Union Marrakush Society v. CBS Broadcasting, Inc.</u> ("<u>Florida</u>

<u>Action - IV</u>"), Civil Action No. 09-60830 (ASG) (S.D. Fla.) (initiated on June 3, 2009);

<u>Inter-Continental Aboriginal Union Marrakush Society v. The Washington Post Company</u>,

("<u>Florida Action - V</u>"), Civil Action No. 09-60831 (UU) (S.D. Fla.) (initiated on June 3, 2009);

<u>Marrakush Society v. City of Dania Beach, Inc.</u> ("<u>Florida Action - VI</u>"), Civil Action No. 09-

60866 (WPD) (S.D. Fla.) (initiated on June 9, 2009); and <u>In re El</u> ("<u>New York Action</u>"), Civil

Action No. 09-406 (E.D.N.Y) (initiated on June 26, 2009).

On July 30, 2009, Judge Simandle issued an order ("Marrakush-Order") and

accompanying opinion ("Marrakush-Opinion") addressing the entirety of the Marrakush Society

Cases.  <u>See</u>, <u>e.g.</u>, <u>Marrakush Society v. Township of Newfield</u>, Civil Action No. 09-3591

(D.N.J.), Docket Entries Nos. 3 and 4 (replicating Marrakush-Order and Marrakush-Opinion in

the docket entries); <u>see</u> <u>also</u> <u>Marrakush Soc'y v. N.J. State Police</u>, 2009 U.S. Dist. LEXIS 68057,

at *134-48 (D.N.J. July 30, 2009) (replicating the text of Marrakush-Order online); <u>see</u> <u>id.</u> at *3-

134 (replicating the text of Marrakush-Opinion online).

**a.**     **Plaintiff(s)/Petitioner(s) in the Marrakush Society Cases**

The submissions made in the Marrakush Society Cases were signed by three litigants.

One of these litigants referred to himself as "Noble Æmer Shyaam M.K. El" ("M.K."), another

referred to himself as "Noble Æmer Shyaam K.S. El" ("K.S"), and the third one referred to himself as "Universal Supreme Allah Bey" ("Bey").[5]

Moreover, in their submissions, these litigants made frequent assertions that they: (a) were represent*ing* the interests of their juridical entity, i.e., the "Marrakush Society"; and (b) were represent*ed* by legal counsel in the form of so-called Aboriginal Law Firm ("Aboriginal Law Firm").

---

[5] Reflecting on the peculiarity of these designation, Judge Simandle observed as follows:

The Court has no certainty that "Shyaam" is an actual first name of either M.K. or K.S. Rather, it appears that "Shyaam" is an assumed alias, seemingly presenting a variation of the word "Shyam," which is one of 108 names for Krishna. See <<http://www.iloveindia. com/spirituality/gods/krishna/krishna-names.html>>. Similarly, "El" does not appear to be an actual last name of either M.K. or K.S.; rather, it seems to be a self-added suffix indicating M.K. and/or K.S.'s belief as to their ancestry in ancient Moors . . . the phrase "Noble Æmer" appears to be not a name but a fictitious self-granted title. See <<http://www.merriam- webster.com/dictionary/emir>> (clarifying that the word "emir" means "a ruler, chief, or commander in Islamic countries"); see also <<http://www. britannica.com/EBchecked/topic/185879/emir>> (explaining that, in the Muslim Middle East, the term "emir" designates a military commander, governor of a province, or high military official). Hence, short of the letters "M.K." and "K.S." (which might or might not be the abbreviations of M.K. and/or K.S.'s actual names), the Court has no certainty as to either the identities or even actual existence of M.K. or K.S. and can extrapolate from these designations only that, if they both do exist, they are likely to be male since – had they been females – they would probably utilize the noun "Æmera." [Moreover, g]ranted that "Allah" means "God" in Arabic and refers to the supreme deity, see Reza Aslan, No god but God: The Origins, Evolution, and Future of Islam (2006), Bey's "name" appears to be a fictitious self-granted title (implying that Bey sees himself as the "universal supreme god descending from 'Bey'-suffixed Moors"). Since one of the pleadings signed by Bey is a complaint suggesting that those who associate themselves with the Marrakush Society designate their fictitious self-granted titles as "attributes," see Marrakush Society v. Township of Newfield, 09-3591 (D.N.J.), Docket Entry No. 1, at 1 ("I [don't] have a name. I have an attribute"), the Court will utilize the term "attribute" to designate all such self-granted titles.

Marrakush Soc'y, 2009 U.S. Dist. LEXIS 68057, at *3-5, nn. 1 and 2.

Addressing the litigants' references to the "Marrakush Society" and "Aboriginal Law Firm," Judge Simandle noted that:

a.   it was unclear from the face of the pleadings submitted in the Marrakush Society Cases whether the Marrakush Society was an actual juridical entity or a social group of individuals, although it was certain that this group maintained a social webpage, which:

  (i)   asserted that the Marrakush Society was located at "Marankokush Principality, Timbuctoo Territory, Samal Shariq, MA," a non-existing geographic designation;

  (ii)   was adorned with images of and references to different Middle Eastern and North and Western African antique symbols, architectural monuments and medieval geo-political bodies, such as Egyptian "Eye of Ra," Malian Sankore Mosque, ancient city of Marrakesh, etc.; and

  (iii)   utilized Arabic terminology, frequently distorted in its English transcription.

  See Marrakush Soc'y, 2009 U.S. Dist. LEXIS 68057, at *6-10.

b.   the "Aboriginal Law Firm," an entity not registered with the Office of Attorney Ethics ("OAE") as a provider of legal services in the State of New Jersey, also maintained social webpages (adorned, inter alia, with Themis' blind-folded head impaled on the Scales of Justice and the symbol of the Moorish Science Temple of America).   On these webpages, the Aboriginal Law Firm advertised its "services," which included seemingly lawyerly tasks (such as corporate dissolution), tasks that could not be performed by any private legal practitioner (such as execution of "Notices to the Bar," "Baptismal Records," "Federal Criminal Complaints," etc.) and tasks that made no sense whatsoever (such as

execution of "Nationality Proclamations," "Records of Aboriginality," "National and International Bills of Exchange," "Certificates of Nativity," etc.).  See id. at 10-21.

**b.      Mode of Submissions Made in the Marrakush Society Cases**

Since the "Aboriginal Law Firm" was not a legal counsel duly admitted to practice, M.K., K.S. and Bey made pro se appearances on behalf of both the Marrakush Society and Aboriginal Law Firm and, in addition, applied for in forma pauperis status of behalf of these questionably existing juridical entities.  In conjunction with these applications,  M.K., K.S. and Bey submitted for filing in the nineteen Marrakush Society Cases:

a.     *over four dozen* pleadings,[6]  discussing M.K., K.S. and Bey's classification of ethnicies within the black race; these statements were heavily peppered by references to the Barbary Treaties, United Nations documents, United States Constitution, United States Supreme Court Justices, the FBI, United States President, etc., and

b.     dozens of copies of such documents as the Barbary Treaties, the United Nations Declaration on the Rights of Indigenous Peoples, etc., and, also

c.     hundreds of pages of homemade quasi-documents, bearing such titles as "records certifications by body custodian," "trademark notices," "verified declarations in the nature of an affidavit of truth in commerce, and contract for waiver of tort/trademark notice/affidavit of fact," "All Rights to Travel Reserved," "criminal complaint warrants," "color of law - misconduct complaint" warrants, "civil application - misconduct

---

[6]  Submissions in some Marrakush Society Cases included up to fourteen complaints per single matter.  See, e.g., Marrakush Society v. Township of Willingboro, Civil Action No. 09-3503 (D.N.J.) (fourteen complaints); Marrakush Society v. Township of Willingboro, Civil Action No. 09-2522 (D.N.J.) (nine complaints).

complaint" warrants, "trade dress infringement civil action warrants,"  "civil action-trade dress infringement-complaint-warrants," etc., and, still in addition to the above,

d.      flocks of apostles certifying unspecified documents, hand-made sketches resembling the Hobo-Dyre Equal Area Projection map,[7] and analogous incomprehensible paperwork.

All these submissions were heavily laden with Arabic and quasi-Arabic terminology, designations of geographic locales composed merely of Earth coordinates combined with references to imaginary "principalities" and "territories," Hijri calendar dates,[8] and riddle-like, self-created "Marrakush" argot.[9]  Providing an example of one of such "complaints" incorporated in these submissions, Judge Simandle quoted the following excerpt:

---

[7]  The Hobo-Dyer Equal Area Projection is a "south-up" depiction of the world map, with the size of North American and European continents reduced – in comparison to a conventional map – in order to reflect the actual size of these continents.  See Ward Kaiser And Bob Abramms, Seeing Through Maps: Many Ways to See the World 26 (2004).

[8]  "Hijri calendar" is Islamic lunar calendar commonly used by Muslims.  See Ahmad S. Dallal, Hijri Calendar: An entry from Macmillan Reference USA's – Encyclopedia of Islam and the Muslim World (2004). Since the first year in Hijri calendar is the year during which prophet Muhammad left the city of Mecca for Medina, the current year (that is, the year 2011 in Gregorian calendar) is – according to Hijri calendar – the year 1432.  See <<http://www.islamic finder.org/Hcal/index.php?lang=>> (providing an online conversion of Gregorian to Hijri dates).

[9]  It appears that, upon reading dozens of complaints submitted in the Marrakush Society Cases, Judge Simandle was able to decipher some of the phrases composing the argot used by M.K., K.S. and Bey.  For instance, it appears that the phrase "solar vessel" is used to designate the torso of the plaintiff's body, the phrase "solar plexus" is used to designate the plaintiff's head, the term "carpomedicarpols" is used to designate the plaintiff's hands, the phrase "five star traveler" is used to designate the plaintiff's companions, the phrase "vessel of conveyance" is used to designate a police car, the phrase "to commandeer the mobile vessel" is used to imply that the plaintiff is driving, the phrase "to drench my solar vessel in unnatural water" is used to imply that the plaintiff is directed to take a shower at jail, the world "trespass" is used to imply that a policeman is approaching the plaintiff, etc.  See, generally, Marrakush Soc'y, 2009 U.S. Dist. LEXIS 68057.

On the Twenty Seventh day of Shawwal, in the year One Thousand Four Hundred and Twenty Nine, Murakush calendar, . . . between 2100 Hours and 0200 Hours, I was accosted while traveling North East in a Mobile Vessel, within the Marankokush Principality, in the Timbuctoo Territory, of the Samal Shariq Abeka Region, Samal Marika, at approximately between Earth Coordinates 40 [degrees] 2'41.83"N. 74[°] 50'3.44"W, and 40[°] 7'17.16"N. 74[°] 43'8.09"W; at a Sea Level of approximately 15.24 Meters, to 21.336 Meters, by an unidentified STATE OF NEW JERSEY Driver and Agent for the Defendant the NEW JERSEY STATE POLICE for the Defendant the STATE Of NEW JERSEY (Herein after referred to as JOHN DOE). JOHN DOE engaged the Mobile Vessel I was commandeering, and demanded to see a "Drivers License, Registration, and Insurance Card".  I presented JOHN DOE with a World Service Administration Passport, issued from World Service Authority; relative to my Identification, and Insurance and Registration of the Mobile Vessel, I was traveling in. I asked JOHN DOE "what is the probable cause?"  JOHN DOE stated that the probable cause for interrupting my travels was that he believed he saw me talking on a Cellular Telecommunication Device.  JOHN DOE maneuvered his way to the Vessel or conveyance he was driving, along with the Instruments that I presented to him. JOHN DOE returned in the Mobile Vessel or Conveyance that I was commandeering, and said "step out of the car."  I replied "what for"? JOHN DOE replied "step out of the car sir."  Under Threat, Duress, and Coercion I exited the Mobile Vessel for the reason and purpose of not being physically harmed, battered and abused.  Upon exiting the Mobile Vessel, JOHN DOE, and another unidentified agent for the Defendant the NEW JERSEY STATE POLICE, grabbed the arms of my Solar Vessel and chained the Carpomedicarpols of my Solar Vessel together.  My Solar Vessel was trafficked to the right side of a Vessel or conveyance, bearing the Corporate Name "NEW JERSEY STATE POLICE". While being harbored on the right side of the Vessel or conveyance bearing the Corporate Name "NEW JERSEY STATE POLICE" I asked JOHN DOE why he was arresting me?  He stated that there was a warrant under the "Name" Shyaam and began to use his hands to examine the pockets attached to the trousers and coat covering my Solar Vessel.  He also used his hands to examine the Indigenous genital areas of my Solar Vessel.  Upon completion of his examination, my Solar Vessel was then forced into the back of a Vessel or conveyance bearing the Corporate Name "NEW JERSEY STATE POLICE", and trafficked to a fixture being administered by the Defendant the NEW JERSEY STATE POLICE: domiciled within the Shecabee Principality in the Zankikan Territory, of the Samal Shariq Abeka Region; Samal Marika. at approximalely Earth Coordinates: 40[°] 8'59.78"N. 74[°] 42'2.49"W at a Sea Level of approximately 18.8976 Meters.  My Solar Vessel was trafficked to a room within the fixture being administered by the Defendant the NEW JERSEY STATE POLICE.  The Carpomedicarpols of my Solar Vessel were chained, and shackled to a small wooded rail within this room.  Soon after, JOHN DOE used his hands in examine

the clothing on my Solar Vessel, and the Indigenous genital areas of my Solar Vessel again without my consent.  After a few minutes JOHN DOE entered the small room, and gave me a small carded instrument to read.  He demanded that I read it.  I declined, and then he exited the room.  I sat on the wooded rail . . . and then my Solar Vessel was trafficked to a fixture domiciled within the Marankokush Principality, in the Timbuctoo Territory, of the Samal Shariq Abeka Region, Samal Marika, at Earth Coordinates: 39[°] 59'45.73"N, 74[°] 4727.25"W; at a Sea Level of precisely 10.0584 Meters, being administered by the BURLINGTON COUNTY JAIL or BURLINGTON COUNTY DETENTION CENTER.[10]

Marrakush Soc'y, 2009 U.S. Dist. LEXIS 68057, at *72-75 (punctuation and capitalization preserved from the original Marrakush Society Cases submission).

_____

[10] In addition, Judge Simandle quoted a sample "cover letter" attached to Marrakush Society submissions.  This sample "cover letter" read:

> The Marrakush Society is an Ecclesiastical Imperial Civil Jural Society and Aboriginal Entity on file with the Gloucester County Clerk of New Jersey, Docket Entry No: 50480, MS 14 230, Cumberland County Clerk of New Jersey, Instrument No: 341828 Bk: 4057, Pg: 6579, Secretary of the District of Columbia Apostille No: 201512 and Broward County Record Division of Florida, Instrument No: 108385178 Bk: 459050, Pg: 842, Secretary of State, State of Florida Apostille No: 2009-466.  Pursuant to the Barbary Treaties with Murakush Empire, the United Nations Declaration on the Rights of Indigenous Peoples, IACHR Inter-American Draft on the Right of Indigenous Peoples, and Florida State Statute Title XXXVI, Chapter 622.  Crandall v. Nevada, 73 U.S. 35 (1867) provides that all Sovereign and Private Civilians shall have free access to all judicial proceedings.  Always in Honor! Noble Æmer A.M. El.

Marrakush Soc'y, 2009 U.S. Dist. LEXIS 68057, at *34-35.

Judge Simandle observed that the riddle-like argot utilized in the submissions made in the Marrakush Society Cases was, seemingly, not a result of the litigants' limited command of English language.  Rather, this argot was a mockery of the court (or was driven by the litigants' interest in confusing the court).  See id., at *18-19 and 87 (observing that the web video clips released by the Marrakush Society contained,  not a shred of paraphernalia uniquely marking each and every submission made in the Marrakush Society Cases; rather, these video clips invariably "utilizes plain and clear English . . . , without ever resorting to any imaginary terms, Arabic or quasi-Arabic words, euphemisms, riddles . . . references to 'Marrakush' history, Hijri calendar [dates,] or . . . Earth coordinates and fictitious geographic terms . . . .").

c. **Judge Simandle's Determinations**

As noted <u>supra</u>, Judge Simandle dismissed the entire compilation of the Marrakush

Society Cases; duplicative submissions were dismissed with prejudice, while all others were

dismissed with leave to cure their respective deficiencies.

Detailing these deficiencies, Judge Simandle first took judicial notice of the submissions

made and rulings entered in the <u>New York Action</u>, <u>Delaware Action</u> and <u>Florida Actions - I to</u>

<u>VI</u>.  <u>See</u> <u>Marrakush Soc'y</u>, 2009 U.S. Dist. LEXIS 68057, at *25-50 (extensively detailing

systemic abuses of the federal legal system by M.K. and other persons, who referred to

themselves as "the Aboriginal Indigenous Grand Sheik, Ambassador, and Consular of the

Marrakush Science Temple, of the Timucua Principality of the Tekesta Territory, Noble Æmer

A.M. El," "Sheik Shaman Raz Amun Ra El," "High Priestess Æmpress T.M. El Bey," etc. and

who also asserted that, in addition to acting on behalf of the Marrakush Society, they were also

representing a certain "Intercontinental Aboriginal Union");[11] <u>accord</u> <u>Jackson v. Broad. Music,</u>

<u>Inc.</u>, 2006 U.S. Dist. LEXIS 3960, at *18 (S.D.N.Y. Jan. 31, 2006) ("the court may take judicial

notice of public records[,] . . . pleadings and other documents . . . filed by a party in other judicial

proceedings").  After deciphering, wherever possible, the gist of the Marrakush Society's claims,

<u>see</u> <u>Marrakush Soc'y</u>, 2009 U.S. Dist. LEXIS 68057, at *50-85, Judge Simandle concluded as

follows:

> The . . . submissions made in the [Marrakush Society Cases] suffer of numerous
> deficiencies.  For instance, in complete disregard of the guidance provided to

_____

[11]  The <u>Florida-V</u> action included references to a television report about the Marrakush
Society; the report, apparently, defined the Marrakush Society as a "part of a little known Islamic
faction" consisting of "squatters [who took] over [a] vacant home."  <u>Marrakush Soc'y</u>, 2009 U.S.
Dist. LEXIS 68057, at *41.

[these litigants] by the judges in the Southern District of Florida, [they] keep filing
their civil complaints naming the Marrakush Society as the plaintiff but without
submission of filing fees: they substitute the filing fees with in forma pauperis
applications of private persons.  . . .  Furthermore, all applications are submitted
on the letterhead or with a reference to the Aboriginal Law Firm, creating an
impression that the Aboriginal Law Firm is the [litigants'] counsel.  However,
notices of appearance by attorneys actually admitted to the bar and to practice
before this Court have not been submitted, and the information released by the
Aboriginal Law Firm in public domain causes substantial doubts even as to the
legitimacy of the Aboriginal Law Firm as a juridical entity.  . . .  Additional
concerns are raised by the Marrakush Society's allegations that assert claims of
third parties.  Moreover, a number of actions at hand contains . . . up to fourteen . .
. sets of pleadings, in violation of Local Rule 7 (specifying that an action must be
commenced by the filing of "a" complaint, in singular).  Furthermore, even if
these complaints are construed as parts of the same submission, they fail to meet
the requirements posed by Rules 18 and 20 of the Federal Rules of Civil
Procedure. . . .  In addition, the civil complaints docketed in these matters
systemically seek arrest of the defendants and initiation of criminal proceedings
against them.  Finally, the complaints are executed in a nearly incomprehensible
made-up, foreign and obscure language, contain factless self-serving conclusory
statements and fail to meet the pleading requirements of Rule 8 (even though
these requirements were explained and re-explained to [these litigants] by the
Southern District of Florida) .  . . .  In light of the foregoing, the Court finds it
useful to provide [these litigants] with guidance as to the aforesaid deficiencies in
order to: (a) allow [them] an opportunity to cure their legal practices; and (b) to
put [them] on notice of what the courts expect from their legal submissions and
the likely dire consequences of [their] failure to meet these expectations.

Id. at *85-88.

Toward that end, Judge Simandle provided M.K., K.S., Bey, the Marrakush Society,

Aboriginal Law Firm and their associates with an explanation that:

a.      a juridical entity, such as the Marrakush Society or Aboriginal Law Firm, cannot

        prosecute a legal action while appearing in forma pauperis.  See id. at *88-92 and nn. 43-

        45 (noting that this point had already been clarified to these litigants six times over by

        other federal district courts but stressing that the litigants who are impoverished natural

        persons may apply for in forma pauperis status);

b.    "[s]ince [these litigants] were already [explained] by the judges in the Southern District of

Florida that any juridical entity (meaning, any fictitious/artificial/legal person) cannot

appear in legal proceedings pro se, [Judge Simandle's] repetition of the same point

[would be] trite at best." See id. at *93-96 and n. 46 (expressly pointing out that the

Marrakush Society, Aboriginal Law Firm or any other juridical entity "must -- if they

desire to litigate -- obtain a duly admitted attorney as their legal counsel to commence an

action.  While, in some limited circumstances, the Court can appoint a pro bono counsel

to represent a litigant in a civil matter, such appointment is not available to [juridical

entities] because . . . these 'entities' [cannot] qualify for in forma pauperis status) (citing

United States v. McQuade, 647 F.2d 938, 940 (9th Cir. 1981), cert. denied, 455 U.S. 958

(1982));

c.    "[i]n order to be a litigant in legal proceedings, the litigant – regardless of whether it is a

juridical entity or a natural person – must . . . have standing to sue." Id. at *96-102 and

nn. 47-48 (detailing the roots of the "standing to sue" concept in the Article III and also

expressly spelling out that "the Court is not required to guess the identity of a plaintiff,

since Local Rule[s] require[] that the initial pleading 'shall state in the first paragraph the

street and post office address of each named party to the case or, if the party is not a

natural person, the address of its principal place of business," and "[a] complaint that

supplies a pseudonym for a party or a nonsensical address for that party (or for the party's

counsel) does not meet these simple requirements and cannot be filed") (quoting Local

Civil Rule 10.1(a));

d.   the rigorous requirements of the "next friend" doctrine create a very "narrow exception to

the 'case or controversy' requirement set forth in the Article III of Constitution."  Id. at

103-04 (detailing the two-prong jus tertii test articulated in Whitmore v. Arkansas, 495

U.S. 149, 154-55 (1990));

e.   additional limitations are imposed by Rule 18 upon a plaintiff's ability to join claims, and

this requirement is preceded by the transactional-relation requirement of Rule 20.  See id.

at *104-09 (detailing the gist and quoting Fed. R. Civ. P. 18 and 20, as also quoting the

guidance provided in George v. Smith, 507 F. 3d 605, 607 (7th Cir. 2007));

f.   the pleading requirements of Rule 8, as elaborated upon in Ashcroft v. Iqbal, 129 S. Ct.

1937 (2009), and Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), obligate the plaintiff

to submit a clear and concise statement of facts showing he/she/it is entitled to relief.  See

Marrakush Soc'y, 2009 U.S. Dist. LEXIS 68057, at *110-21 (detailing, inter alia, general

pleading requirements as well as requirements with regard to pleading claims against

municipalities and supervising officials); and

g.   "[i]t is well within the broad scope of the All Writs Act, 28 U.S.C. § 1651(a), for a

district court to issue an order restricting the filing of meritless cases by a litigant whose

manifold complaints aim to subject defendants to unwarranted harassment, and raise

concern for maintaining order in the court's dockets."  Id. at 131-33 (explaining, in no

ambiguous terms, that litigants cannot abuse legal process through means of recreation

litigation).  Judge Simandle concluded his discussion by stating:

> The Court . . . strongly urges [these litigants] to treat their future litigations
> in this District (and in other courts) with utmost seriousness.  This
> [District] will not tolerate frivolous litigation that wastes judicial

resources.  While the Court will give [these litigants'] instant applications the benefit of the doubt and will administratively terminate the actions commenced by [them] with leave to have [some] of these matters reopened upon submission of proper documents, [this District] will deem [these litigants] charged with knowledge of all legal guidance provided to [them] in [the <u>Marrakush-Opinion</u>] and the guidance provided to the [them] by the judges in the Southern District of Florida.  The Court expressly warns [these litigants] that any future abuse of legal process (be it with regard the matters currently before the Court or with regard to any other action [they] commence in this District) would trigger sanctions and/or an imposition of severe limitations on the ability to file a case in the future.

<u>Id.</u> at 133-34.

### d.    Judgement Entered in the Marrakush Society Cases

Upon providing M.K., K.S. and Bey with the above-summarized guidance, Judge Simandle issued the Marrakush-Order, pursuant to which:

a.    <u>El. v. Cox</u>, Civil Action No. 09-3372 (N.J.D.), was administratively terminated without leave to reopen, as duplicative of the matter <u>El. v. Cox</u>, Civil Action No. 09-3371 (N.J.D.);

b.    <u>El. v. Cox</u>, Civil Action No. 09-3371 (N.J.D.), was administratively terminated with leave to amend;

c.    <u>Marrakush Society v. Township of Willingboro</u>, Civil Action No. 09-2522 (N.J.D.), was administratively terminated with leave to amend as to the first complaint out of the nine complaints submitted in that matter, while the remaining complaints were dismissed as duplicative of those filed in other Marrakush Society Cases;

d.    <u>Marrakush Society v. Township of Willingboro</u>, Civil Action No. 09-3503 (N.J.D.), was administratively terminated with leave to amend as to the eighth complaint out of the

fourteen complaints submitted in that matter, while the remaining complaints were dismissed as duplicative of those filed in other Marrakush Society Cases;

e.    Marrakush Society v. Township of Westampton, Civil Action No. 09-25219 (N.J.D.), was administratively terminated with leave to amend as to the first complaint out of the two complaints submitted in that matter, while the second complaint was dismissed as duplicative of its numerous replications filed in other Marrakush Society Cases;

f.    Marrakush Society v. Township of Westampton, Civil Action No. 09-3441 (N.J.D.), was administratively terminated without leave to amend, as duplicative of the first complaint submitted in Marrakush Society v. Township of Westampton, Civil Action No. 09-2521 (N.J.D.);

g.    Marrakush Society v. Township of Pennsville, Civil Action No. 09-3502 (N.J.D.), was administratively terminated without leave to amend, as duplicative of the first complaint submitted in Marrakush Society v. Township of Pennsville, Civil Action No. 09-2519 (N.J.D.);

h.    Marrakush Society v. Township of Westampton, Civil Action No. 09-2521 (N.J.D.), was administratively terminated with leave to amend as to the second complaint submitted in that matter, while the remaining complaints were dismissed as duplicative of those filed in other Marrakush Society Cases;

i.    Marrakush Society v.Township of Mansfield, Civil Action No. 09-3505 (N.J.D.), was administratively terminated without leave to amend, as duplicative of Marrakush Society v. New Jersey State Police, Civil Action No. 09-2518 (N.J.D.);

j.      <u>Marrakush Society v. New Jersey State Police</u>, Civil Action No. 09-2518 (N.J.D.);

<u>Marrakush Society v. Township of Pennsville</u>, Civil Action No. 09-2519 (N.J.D.);

<u>Marrakush Society v. Township of Willingboro</u>, Civil Action No. 09-3392 (N.J.D.);

<u>Marrakush Society v. Township of Westampton</u>, Civil Action No. 09-3442 (N.J.D.);

<u>Marrakush Society v. Burlington County Jail</u>, Civil Action No. 09-3504 (N.J.D.);

<u>Marrakush Society v. Superior Court of New Jersey</u>, Civil Action No. 09-3506 (N.J.D.);

<u>Marrakush Society v. Township of Mount Laurel</u>, Civil Action No. 09-3507 (N.J.D.);

<u>Marrakush Society v. Township of Vineland</u>, Civil Action No. 09-3589 (N.J.D.);

<u>Marrakush Society v. Township of New Jersey State Police</u>, Civil Action No. 09-3590 (N.J.D.); and <u>Marrakush Society v. Township of Newfield</u>, Civil Action No. 09-3591 (N.J.D.), were administratively terminated with leave to amend; and

k.      the Marrakush Society and/or the Aboriginal Law Firm could have their cases reopened upon submission of: (i) a filing fee of $ 350; (ii) a clear and concise complaint, executed by (iii) legal counsel duly admitted to appear in this District, while

l.      natural persons like M.K., K.S. and Bey could have their cases reopened upon timely submission of: (i) either a duly executed application to proceed <u>in forma pauperis</u> or filing fee of $ 350; and (ii) a clear and concise complaint, signed by the plaintiff(s) pursuant to Rule 11(a) of the Federal Rules of Civil Procedure and requirements of the Local Rules.

<u>See</u> Marrakush-Order (also directing complimentary service of the Marrakush-Opinion on the OAE and other district courts affected by the Marrakush Society/Aboriginal Law Firms actions).

As noted <u>supra</u>, Judge Simandle's decision was entered on July 30, 2009.  No submissions of <u>in forma pauperis</u> applications or amended pleadings, appearances of counsel,

prepayment of filing fee etc., were ever made in the Marrakish Society Cases.  Rather, all leaves
to amend provided-for in the Marrakush-Order expired unused at the end of August 2009, about
a year and a half prior to initiation of the Instant Matter and Califate proceedings.

### 2.   The *Estate Case* and Another Court's Action Detected in 2009

Just ten days after Judge Simandle's issuance of the Marrakush-Opinion and
accompanying Marrakush-Order, the Clerk received another submission from "Divine Minister
Plenipotentiary Noble Æmer" M.K.  See Estate of Brandon Casimir v. State of New Jersey
("Estate Case"), Civil Action No. 09-4004 (N.J.D.).  In addition to M.K., three other litigants
were named as plaintiffs in that submission, one of these litigants was referred to as "Divine
Minister Plenipotentiary Noble Æmer Kernel C. El," while the two others were referred to as
"Estate of Brandon Casimir, Expatriate Decedent" and "Estate of Cornell Hall/Dixon, Expatriate
Decedent."[12]  See id.

The submission: (a) indicated M.K. and K.C.'s interest in removal of their then-pending
state criminal proceedings to this District;[13] (b) included K.C.'s application to proceed in forma
pauperis; but (c) simultaneously asserted that the State of New Jersey and townships of Mount

---

[12]   The totality of these submissions suggested that the actual name of "Divine Minister
Plenipotentiary Noble Æmer K.S." was "Brandon Casimir," while the actual name of "Divine
Minister Plenipotentiary Noble Æmer Kernel C. a/k/a K.C." was either "Cornell Hall" or
"Cornell Dixon."  Submissions made in the Instant Matter suggest that the actual name of "Bey"
might be either "Scott McArthur" or "Alvin McArthur."

[13]   The notice of removal docketed in the Estate Case asserted that M.K. and K.C.'s state
criminal proceedings ensued from a criminal indictment No. 08-04-441-I, which – according to
the notice of removal – arose from Plaintiffs' possession of "fraudulent United States Department
of State Public Minister Credentials."  See Estate Case, Docket Entry No. 1, at 2.  Public records
revealed that the proceeding associated with indictment No. 08-04-441-I was initiated on the
grounds of M.K. and K.C.'s possession of cocaine, as well as their presentments of fraudulent
public minister credentials.  See Estate of Casimir, 2009 U.S. Dist. LEXIS 78113, at *8.

Laurel and Willingboro owed K.C. $60 million.  Substantively, the submission made in the

Estate Case mirrored those made in Thompson v. Delaware, 09-00446 (SLR) (D. Del.)

("Delaware Action-II"), where M.K. and K.C. also sought removal of their, seemingly different,

state-court criminal prosecution to the United States District Court for the District of Delaware.

     Same as Judge Robinson of the District of Delaware in the Delaware Action-II, Judge

Simandle denied K.S. and M.C.' application for removal, re-explaining once again that:

a.     fictitious aliases unassociated with actual names and actual addresses cannot be litigants

since "a name is not an entity that can initiate a legal suit."  Estate of Casimir v. New

Jersey, 2009 U.S. Dist. LEXIS 78113, at *8-9 (D.N.J. Aug. 31, 2009) (citing Marrakush

Cases, 2009 U.S. Dist. LEXIS 68057, at *96-102 (citing, in turn, Havens Realty Corp. v.

Coleman, 455 U.S. 363, 378-79 (1992), and Cetacean Cmty. v. Bush, 386 F.3d 1169 (9th

Cir. 2004)));

b.     fictitious "estates of decedents" similarly cannot be litigants since their existence is not

supported by a finding of probate court, which is needed to give these "estate" juridical

existence, and – in any event – the physical body of a decedent cannot be the subject of

any "estate."  See id. at *9;

c.     a juridical entity cannot proceed in a legal matter pro se.  See id. at 10; and

d.     juridical entities cannot proceed in forma pauperis.  See id. at *11.

Estate of Casimir, 2009 U.S. Dist. LEXIS 78113, at *8-12.

     Upon so re-explaining, Judge Simandle turned to K.S. and M.C.' application for removal,

denied it on various procedural and jurisdictional grounds, and remanded the Estate Case to the

state courts, while observing that M.K. and K.C.'s "Notice of Removal amounts to a sham pleading filed in disregard of well-settled legal principles." See id. at *12-22.

## II.    CURRENT ROUND OF SUBMISSIONS

The submissions the Instant Matter and Califate were made of the same date, i.e., March 8, 2011, and were largely analogous as far as the content of initial packages was concerned.

### A.    CONTENT OF THE SUBMISSIONS MADE IN THE INSTANT MATTER

#### 1.    Initial Submissions

Six documents were initially submitted in the Instant Matter, all asserting that "Murakush Caliphates of Amexem" ("Murakush-Amexem") is the sole plaintiff in this action.  Only four of these documents conveyed any meaning: the "Complaint," application to proceed without prepayment of filing fee, motion for appointment of pro bono counsel and "Order" directing injunctive relief.

##### a.    Application to Proceed Without Prepayment of Filing Fee

Murakush-Amexem's application to proceed in the Instant Matter without prepayment of filing fee read, in relevant part, as follows:

> I, Caliph: Shyaam M. K. El am the Chief Executive Officer of the plaintiff in the above entitled case.  This is a motion to proceed without being required to prepay fees or cost . . . .
> 1.    Presently I, the Ministers, and Members of the Murakush Caliphate currently does not receive any salary for the discharge of our duties and obligations as Ministers and Members of the Murakush Caliphate of Amexem.
> . . .
> 6.    The past incarcerations of many members of this entity are a circumstance this court should consider in this application.
> 7.    The Murakush Caliphate of Amexem respectfully requests that this court accepts a Private Bond of $20,000, 2% interest issued from the Murakush

> Imperial Fund with CUSIP and ISIN[14] Numbers as Good Faith
> Consideration for payment of fees.  Bond is set at a limit of $20,000 . . . .
> . . .
> The Murakush Imperial Temple of Amexem Inc., is a d/b/a/ of the Murakush
> Caliphate of Amexem Inc.  The Bond issued to the U.S. Government from the
> Murakush Imperial Fund, by the Murakush Caliphate of Amexem Inc. has been
> issued for the purposes of payment of all fees in relation with the filings by the
> [Instant Matter, Caliphate] and Murakush Caliphate of Amexem vs. State of
> Delaware.
> Always In Honor!
> Shyaam M. K. El ["signature"]

Docket Entry No. 1-2.

This submission was accompanied by a homemade "bond," which:

a.      was thickly peppered with repeats of the word "copy";

b.      had its central part decorated with the wording "Murakush – Imperial Temple of Amexem

        – Murakush Imperial Temple of Amexem Inc. – Incorporated Under the Laws of the State

        of Colorado";

c.      contained inscription reading, "Know All Men By These Presents.  This Certifies that

        MURAKUSH IMPERIAL FUND Hereby issues A Private Temple/Church Bond.  To the

        'UNITED STATES GOVERNMENT,' In the Aggregate Sum Total of $20,000.00.  This

---

14 "The acronym CUSIP typically refers to both the Committee on Uniform Security
Identification Procedures and the 9-character alphanumeric security identifiers that they distribute
for all North American securities for the purposes of facilitating clearing and settlement of trades.
The CUSIP distribution system is owned by the American Bankers Association and is operated
by Standard & Poor's.  The CUSIP Service Bureau acts as the National Numbering Association
(NNA) for North America, and the CUSIP serves as the National Securities Identification
Number for products issued from both the United States and Canada."  United States v.
Robertson, 2010 U.S. Dist. LEXIS 9513, at *4 (E.D. Cal. Jan. 13, 2010).   The acronym ISIN
refers International Securities Identification Number, which is a code identifier of a security.  See
London Stock Exchange Aggregated Regulatory News Service (Mar. 24, 2011).  ISIN and
CUSIP are interrelated designations, since CUSIP numbers can be converted into ISIN  numbers
by adding the United States or Canada's country code to the beginning of each particular CUSIP
code and digital designation of the instrument at the end of such CUSIP.

2 Year Bond shall earn 2% (Interest Only) Per Annum and Redeemable at the Maturity

Date of June 26, 2013";

d.    was garnished with "ISIN" and "CUSIP" numbers suggesting that Murakush-Amexem

issued this "instrument" in the United States, and it was its second such "bond"; and

e.    closed with the word "PROTECTED," preceded by two statements, namely,

"WARNING! DO NOT ACCEPT THIS INSTRUMENT IF IT HAS NOT BEEN

SEALED BY THE GREAT SEAL OF THE MURAKUSH IMPERIAL TEMPLE

AMEXEM INC. [illegible] MURAKUSH IMPERIAL TEMPLE OF AMEXEM INC."

and "WARNING! THE RED PROTECTED LOGO BELOW CONTAINS HEAT

SENSITIVE SECURITY INK WHICH SHOULD TEMPORARILY DISAPPEAR

WHEN RUBBED."

Id. at 3 (capitalization, lack thereof, exclamation marks and internal quotation marks in original).

This "bond" was, too, signed by "Shyaam M. K. El."

### b.    Application for Appointment of Counsel

Another document submitted in the Instant Matter was Murakush-Amexem's application

for appointment of pro bono counsel.  See Docket Entry No. 1-4.

The application, also signed by M. K., read, in pertinent part, as follows:

Pursuant to 28 U. S. C. 1915 (e) (1) plaintiff (or Plaintiffs) move for an order
appointing counsel to represent him in this case. In support of this motion,
plaintiff states:
1.    Plaintiff is a non-profit corporation and is limited in litigation abilities.
. . .
4.    Plaintiff is unable to afford counsel.
5.    Plaintiff's has filed a motion requesting leave to proceed without
    prepayment of fees.
. . .

WHEREFORE, plaintiffs authorized representative [i.e., M.K.] request[s] that the court appoint Linda Campbell, William H. Buckman or Susan Chana Lask members of the New Jersey Bar, or Eleanor Capogrosso, Esq.[15] from the New York Bar as counsel in this case.

Id.

### c.    "Order" Directing Injunctive Relief

In addition to the above-quoted applications for appointment of counsel and to proceed

without prepayment of the filing fee, Murakush-Amexem submitted a draft "Order" for this

Court's signature; that "Order" directed Defendants to show cause as to why injunctive relief

shall not be granted.  See Docket Entry No. 1-3.  The "Order" read, in relevant part, as follows:

. . . it is:

ORDERED that defendants . . . show cause . . . why a preliminary injunction should not issue . . . enjoining the defendants, their successors in office, agents and employees and all other persons acting in concert and participation with them, from referring to the plaintiffs as names they have changed for religious and cultural purposes, from charging the plaintiffs with violating New Jersey statues because they possess Moorish credentials, indigenous identifications or plates on their automobiles, from assuming jurisdiction over any moors; and from abrogating the provisions of the 1786-1836 [Barbary] treaties . . . .

Id.

### d.    Complaint

Another document submitted in the Instant Matter was Murakush-Amexem's Complaint,

a twenty-one page production listing the Defendants who were named as defendants a year and a

half ago in the Marrakush Society Cases; the Complaint also added a panoply of additional

---

[15]  The Court has no reason to presume that Linda L. Campbell, William H. Buckman, Susan Chana Lask or Eleanor Capogrosso, Esqs. are in any way associated with – or responsible for the submissions made by – Maurakush-Amexem, or even aware of these submissions.

Defendants.  <u>See</u> Docket Entry No. 1.  Since the list of Defendants was so lengthy, the first seven

pages and three dozen paragraphs of the Complaint were dedicated just to naming Defendants.

Paragraphs 37 to 57 of the Complaint composed the section titled "Facts."  <u>See</u> <u>id.</u> at 7-

18.  These "Facts" presented, effectively, a diary covering three-year period from October 24,

2007, to November 2010, and asserted a panoply of unrelated events associated with: (a) multiple

arrests of M.K., K.C., K.S., "Mrs. El," Bey, as well as multiple arrests of a multitude of other

individuals, on numerous charges, including offenses associated with possession of controlled

substances, driving while intoxicated, etc.; (b) M.K., K.S., K.C. and Bey's numerous

presentments of homemade "Moorish" papers and WSA-produced "world passports" – all in lieu

of driver licenses and other identification/registration/insurance documents deemed valid in the

United States; (c) numerous jail detentions and criminal prosecutions of M.K., K.S., K.C. and

Bey; (d) the prosecutors' performance of their duties – and state judges' issuances of orders –

during these criminal proceedings; and (e) imposition of fines, bails, etc. in connection with the

aforesaid arrests and criminal charges.  <u>See</u> <u>id.</u>

The Complaint concluded with the prayer-for-relief section seeking, <u>inter</u> <u>alia</u>: (a)

declaratory relief in the form of a finding that, under the Barbary Treaties, the rights of natural

persons mentioned in the Complaint were violated;[16] (b) "$20 Million in Attorney's Fee";[17] (c)

---

[16]  The term "Barbary Treaties" refers, collectively, to the treaties executed during the
1795-1836 period between the United States and post-medieval North African "city-states,"
namely Algiers (currently, the capital of Algeria), Tripoli (currently, the capital of Libya) and
Tunis (currently, the capital of Tunisia), and between the United States and the post-medieval
Sultanate of Morocco, which then was part of the Ottoman Empire.  The treaties were executed
in response to the ill of piracy rampant during 15th to 18th centuries in the coastal waters and
ports of the North Africa and the high "protection fees" charged by North African rulers for
maintaining peace in their coastal waters and ports.  <u>See</u> Frank Lambert, <u>The Barbary Wars:</u>
<u>American Independence in the Atlantic World</u> (2007).  These treaties went through numerous

injunctive relief directing the State of New Jersey, state judges, prosecutors, etc. to write letters

of apology to the natural persons mentioned in the Complaint; (d) punitive damages in the

amount of $5 million – and compensatory damages in the amount of $10.5 million – from each

Defendant; and (e) injunctive relief in the form of order vacating all criminal charges/convictions

entered against M.K., K.C., Bey and a certain "Myrsha Faustin-El," who was introduced into the

Instant Matter as "Shaikhess Financial Officer" ("El"). The Complaint was signed by M.K.,

K.C., Bey and El (indicating that all these signatories were residing at 219 West Park Avenue,

Vineland, New Jersey 08360). See id. at 19-20.

### 2.    Following Submissions

Forty five days after the Clerk received these initial submissions, the Clerk docketed a

letter containing a request to amend the Complaint by: (a) substituting the name of one

Defendant from the group of Defendants identified as "unknowns" with the name of a certain

person; and (b) adding three other persons as Defendants in this action. See Docket Entry No. 3.

---

superceding reconfirmations and full/partial terminations resulting from: (a) political turmoils
underwent, during the post-ratification centuries, by these city-states and by the Moroccan
sultanate; (b) the "personal-assurances-of-the-particular-North-African-ruler" unique nature of
these treaties, which required superceding re-confirmations by each successor to the throne; and
(c) political decisions made by the United States. See, e.g., 1795 U.S.T. LEXIS 6, 1815 U.S.T.
LEXIS 4, 816 U.S.T. LEXIS 6 (noting superceding developments as to the Treaty with Algiers
and its turning obsolete upon Algiers becoming French province); 1805 U.S.T. LEXIS 1 (noting
termination of the Treaty with Tripoli in 1912, upon United States recognition of Italian
sovereignty over Libya); 1836 U.S.T. LEXIS 10 (noting termination in part of the Treaty with
Morocco on Oct. 6, 1956); Ruth E. Gordon, Some Legal Problems with Trusteeship, 28 Cornell
Int'l L.J. 301, 347 (1995) (noting loss of independence by the Moroccan sultanate in 1912, after
the Treaty of Fez); <<http://avalonlaw.yale.edu/18th_century/bar 1786n.asp#n4>> (explaining
the need for superceding confirmations of the Treaties due to their "personal-assurances" nature).

[17]  The rationale of Murakush-Amexem's request for attorney's fee is not entirely clear to
this Court in light of Murakush-Amexem's application for appointment of pro bono counsel.

One week later, the Clerk received $350 filing fee for this action.  See Docket Entry of May 12, 2011.

### B.  CONTENT OF THE SUBMISSIONS MADE IN <u>CALIPHATE</u>

The submissions made by Murakush-Amexem in the <u>Caliphate</u> matter largely replicate the submissions it made in the <u>Instant Matter.</u>  See <u>Caliphate</u>, Civil Action No. 11-1316, Docket Entries Nos. 1-3.[18]

Specifically, the <u>Caliphate</u> package included: (a) the same application to proceed without prepayment of filing fee (accompanied by the same homemade "bond"); (b) the same application for appointment of <u>pro</u> <u>bono</u> counsel; and (c) barely altered draft "Order" seeking injunctive relief in the form of prohibition against usage of M.K., K.C., K.S., El and Bey's actual names and against prosecution of these individuals on the grounds of their use of homemade "Moorish" credentials/"world passports."  See <u>id.</u>, Docket Entries Nos. 1-2, 1-3 and 1-4.  In addition, the package includes a "complaint" ("Complaint-<u>Caliphate</u>").  See <u>id.</u>, Docket Entry No. 1.

---

[18] The term "caliphate" means "successor" in Arabic, <u>see</u> <u>God & War: Article: Rhetoric or Reality? Winning the Battle of Ideas</u>, 7 Barry L. Rev. 145, n. 60 (2006) (citing Douglas E. Streusand & Harry D. Tunnell IV, <u>Choosing Words Carefully: Language to Help Fight Islamic Terrorism</u> 4 (May 23, 2006)), and – used as a collective – typically refers to the group of immediate successors of Mohammed.  <u>See</u> Joseph P. Bialke, <u>Al-Qaeda & Taliban Unlawful Combatant Detainees, Unlawful Belligerency, and the International Laws of Armed Conflict</u>, 55 A.F. L. Rev. 1, n.41 (2004).  The socio-geo-political effect of caliphate was creation of state-like entities, with each Caliph (the title pronounced in Arabic as "khalifa") acting as the ruler/leader of his respective state-like entity.  <u>See</u> Khaled Abou El Fadl, <u>Islam and the Challenge of Democracy Commitment</u>, 27 Fordham Int'l L.J 4, 18-19 (2003).  Hence, the key distinction between the sultanate and the caliphate turned on khalifas' claim of their ancestry in the Prophet.  <u>See id</u>; <u>see also</u> Christopher A. Ford, <u>Siyar-ization and its Discontents: International Law and Islam's Constitutional Crisis</u>, 30 Tex. Int'l L.J. 499, 517 (1995) (noting that the "sultanate, based on [the ruler's pure] power, was accepted in lieu of the caliphate for the sake of social peace").

The Complaint-Caliphate is executed by M.K. and K.C., see id. at 13, and it asserts that Judge Simandle violated M.K., K.C., K.S. and Bey's rights by: (a) taking note of the superceding developments underwent by the Barbary Treaties; (b) terminating some Marrakush Society Cases without prejudice and others with prejudice; and (c) denying removal of – and remanding to the state court – the Estate Case.  See id.  In connection with these allegations, the Complaint-Caliphate accuses Judged Simandle of having a "white colonist supremacy agenda" and asserts that Judged Simandle's decisions in the Marrakush Society Cases and Estate Case "show proof of [his] obvious incompetence on the subject matter, lack of judicial and historical fact finding, and [his] furthered attempts to keep [M.K., K.C., K.S. and Bey] under a caste system of peonage for obvious purposes of taxation."  See id.  The Complaint-Caliphate closes with the following prayer for relief:

> WHEREFORE, [Murakush-Amexem] respectfully prays [for the] judgment [of:]
>
> A declaration that the acts [of Judge Simandle] violated [M.K., K.S., K.C. and Bey's] rights under the [United States] Constitution and [under the Barbary Treaties;]
>
> Compensatory damages in the amount of $2.5 million against [Judge Simandle;]
>
> Punitive damages in the amount of $250,000 against [Judge Simandle;] [Murakush-Amexem's] cost in [the Caliphate action;]
>
> Assign[ment of] another judge pursuant to [the Barbary Treaties] to hear [anew the Marrakush Society Cases that were terminated two years ago;] Restrict [Judge Simandle] from ever being a Judge on any [case] brought . . . by the Murakush[-]Amexem . . . or its members . . . [;]
>
> Declare [Judge Simandle] senile and mentally incompetent, and force [him] to resign as a Federal District judge . . . [;]

> Declare [Judge Simandle's Marrakush-]Opinion . . . [a] violation of the [United States] Constitution and [various federal statutes;]
>
> Declare [that Judge Simandle] to have violated  [M.K., K.S., K.C. and Bey's] international, religious, civil and political rights as [self-declared] sovereign [citizens];
>
> Enjoin [Judge Simandle] and any other agency or employee acting on behalf of the United States from enforcing [any state and federal law] against [M.K., K.S., K.C. El and Bey in the event these individuals elect to perceive that law as unconstitutional]; and
>
> Award [Murakush-Amexem] attorney's fees . . . .[19]

Id. at 12-13.

The submission made in Caliphate was followed by two letters from Bey; one of these letters stressed that Murakush-Amexem was not requesting to proceed in the Caliphate matter in forma pauperis, but rather it wished to proceed "without prepayment of fee," with the District accepting its homemade "bond" in lieu of payment.  See Caliphate, Docket Entry No. 2.

## III.   ACTIONS DETECTED IN CONNECTION WITH THE *INSTANT MATTER*

Same as it was during commencement of the Marrakush Society Cases, the Instant Action and Caliphate were initiated in the context of other actions initiated by Murakush-Amexem in this District's sister courts.  This Court detected two such matters, one being Murakush Society Na-Petuh Moorish Science Temple of America v. Wetsel ("Virginia Action"), Civil Action No. 10-0509 (JAG) (E.D. Va.) (filed on July 26, 2010, terminated on Mar. 18, 2011), and other being

---

[19] See supra, note 17 of this Opinion.

Murakush Caliphates of Amexem Inc. v. State of Delaware ("Delaware Action-III"), Civil Action

No. 11-0211 (SLR) (D. Del.) (filed on Mar. 10, 2011).[20]

### A.   *VIRGINIA ACTION*

The submission made in the Virginia Action was analogous to those made in the

Marrakush Society Cases and Estate Case in the sense that totaled 351 pages and included scores

of "records of aboriginality," "All Travel Rights Reserved" productions garnished with Hobo-

Dyer Equal Area Projection sketches, "trademark notices," "contracts" by the Intercontinental

Aboriginal Union, the Aboriginal Law Firm's productions asserting that it is an "attorney-in-

fact," homemade negotiable instruments, affidavits of "expatriation" via "civil death," copies of

US and UN documents, and international treaties, etc.   See Virginia Action, Docket Entries Nos.

1-1 to 1-28.  In addition, the Virginia Action package included a complaint, in which "Murakush

Society" (being, seemingly, a cross-breed between "Marrakush Society" and "Murakush-

Amexem") and the self-declared "estate" of certain Demien Wilson (who, seemingly, self-

renamed himself into M.E. Bey ("M.E.")) relied on the United States Constitution and the

Barbary Treaties striving to raise claims against the state judge presiding over – and the

prosecutor pursuing charges in – M.E.'s criminal proceedings based, inter alia, on M.E.'s

possession of controlled substances.   See id., Docket Entry No. 1.

In January 2011, the Virginia Action was reassigned to Judge John A. Gibney, Jr., See id.

Docket Entry No. 3, who: (a) provided M.E. with a thirty-day window of opportunity to show

standing to litigate claims on behalf of the "Murakush Society" and "estate" named as the

---

[20]   Same as Judge Simandle in his discussion of the Marrakush Society Cases, this Court
stresses that the Court's detection of these two Murakush-Amexem's matters was a result of a
merely brief research and, thus, other recent matters initiated by Murakush-Amexem might exist.

plaintiffs; and (b) terminated the Virginia Action upon M.E.'s failure to timely show cause (or to

submit any other response).  See id., Docket Entry No. 5.

      **B.**     ***DELAWARE ACTION-III***

     A week before Judge Gibney's termination of the Virginia Action – and two days after

initiation of the Instant Matter and Caliphate – Murakush-Amexem initiated another action, that

is, the Delaware Action-III proceedings.  The content of submissions made in the Delaware

Action-III was nearly identical to that of the submissions made in the Instant Matter and

Caliphate.  For instance, the Delaware Action-III submissions included: (a) a virtually identical

application for appointment of pro bono counsel (signed, this time, by K.C. and omitting only the

request to appoint, specifically, Linda L. Campbell, William H. Buckman, Susan Chana Lask or

Eleanor Capogrosso, Esqs. as Murakush-Amexem's counsel); (b) the already-familiar draft

"Order" seeking injunctive relief in the form of prohibition against the usage of M.K., K.C., K.S.,

El and Bey's actual names and against prosecution of these individuals on the grounds of their

presentment/use of homemade "Moorish" credentials/ "world passports"; and (c) the already-

familiar application to proceed without prepayment of filing fee, identically referring to

Murakush-Amexem's homemade "bond."  See Delaware Action-III, Docket Entries Nos. 1, 4

and 5.

     The complaint submitted in the Delaware Action-III, signed by K.C. as Murakush-

Amexem's "Sheikh Operating Officer," asserted that "Murakush[-]Amexem [was] a non-profit

Moorish-al-Marikanos Corporation and organ or instrumentality of the Sultanates of Murakush,

incorporated in the State of Colorado," and described events associated with K.S.'s arrest

ensuing from his driving of a vehicle bearing homemade "Moorish" licence plate, K.S.'s

presentment of homemade "Moorish" identifications, his refusal to be fingerprinted, his arraignment and bail hearing, placement in jail, strip-search upon such placement and sixteen-days-total detention.  See id. Docket Entry No. 2.

The complaint in the Delaware Action-III closed with the prayer for relief seeking: (a) injunction against M.C.'s criminal state proceedings; (b) destruction of all files containing M.C.'s fingerprints; (c) declaration that the state police, correctional officers and state judge violated M.S.'s rights under the United States Constitution and Barbary Treaties; (d) injunctive relief in the form of order directing the state police, correctional officers and state judge to write M.C. letters of apology; (e) $20 million in "attorney fees," $10.5 million in compensatory damages from each named defendant and $5 million in punitive damages from each named defendant; and (f) injunctive relief in the form of order barring any reference to "Moors" as "blacks" or "African-Americans."  See id. at 9.

On April 29, 2011, Judge Robinson issued an order denying application to proceed in forma pauperis or with a "bond" in the Delaware Action-III, and directing plaintiffs to: (a) prepay $350 filing fee; and (b) retain counsel.  See Delaware Action-III, Docket Entry No. 7.

## IV.   REGISTRATIONS FOUND IN CONNECTION WITH THE *INSTANT MATTER*

Since the complaints filed in the Instant Matter, Caliphate and Delaware Action-III all raise claims on behalf of Murakush-Amexem, asserting that this entity was registered with the State of Colorado, a quick verification of that assertion appeared warranted.  The Court's brief review of the documents on electronic file with the Colorado Secretary of State revealed that:

a.     on April 13 and May 9, 2010, six entities having the term "Murakush" were registered in

       Colorado, namely: (i) Murakush-Amexem; (ii) Murakush Imperial Royal Guards LLC;

(iii) Murakush Imperial Temple of Amexem; (iv) Murakush Investment Firm; (v) Murakush Law Firm LLC ("Murakush Law Firm"); and (vi) Murakush Science Temple of America.  See <<http://www.sos.state.co.us/biz/BusinessEntityCriteriaExt.do;jsession id=0000SuWWAdW6ASVF8Z7QtULpL50:11nm0gcsc>>.  All these entities shared the same address, operating from the same "Suite D" of 36 South 18th Avenue, Brighton, CO 80601, see id.;

b.   the "true name and . . . address of the individual causing the . . . filing" of Murakush-Amexem and the Murakush Law Firm's incorporation documents indicated that both filings were made by the same person, K.S., see <<http://www.sos.state.co.us/biz/View Image.do?masterFileId=20101211987&fileId=20101211987, at *3>>; <<http://www.sos. state.co.us/biz/ViewImage.do?masterFileId=20101267577&fileId=20101267565, at *3>>, who then resided at "219 West Park Avenue, Vineland, New Jersey 08360" and – enigmatically enough – also at "6710-F Ritchie Highway, Suite 435, Glen[] Burnie, Maryland 21061,"[21] i.e., in a mailbox of a UPS store, see <<http://www.superpages.com/ bp/Glen-Burnie-MD/The-UPS-Store-1034-L0119887313.htm>>; and

3.   the Murakush Law Firm, same as the Aboriginal Law Firm, existed online as "a private company categorized under Legal Services," see <<http://www.manta.com/c/mtqj1qt/ murakush-law-firm-llc>>, although though it shared its Brighton, Colorado address and even phone number with all other above-listed five Murakush corporations, including

---

[21]  Although the filings made with regard to Murakush-Amexem and the Murakush Law Firm were made with three-week difference, the discrepancy in M.K.'s address cannot be a result of this time-gap, since all other "Murakush" registration entities made by M.K. in Colorado bore the same Vineland, New Jersey, address, regardless of their April 13 or May 9, 2010, filing dates.

with the Murakush Investment Firm (which, in turn, advertized itself as holding "the

Murakush Family & Friends Investment Fund" and as a body trading at foreign currency

exchanges, see <<http://mif.squarespace.com>> and <<http://mif.squarespace.com/

murakush-family-friends-inve/2010/9/1/murakush-family-friends-investment-fund.

html>>).

## V.     DISCUSSION

Since there appears to be no doubt as to Murakush-Amexem's existence as a juridical

entity, and Murakush-Amexem was named as the sole Plaintiff in the Instant Matter, the Court

assesses the submissions at bar accordingly.

### A.     MURAKUSH-AMEXEM CANNOT PROCEED IN FORMA PAUPERIS

Although the filing fee was eventually received in this matter, the Court notes its concern

with the members of Murakush-Amexem initial attempt to be "creative" by submitting: (a) an

application to proceed "without prepayment of filing fee" (and, in Caliphate, stressing that such

application must be deemed a document somehow qualitatively different from a garden variety

application to proceed in forma pauperis ("IFP")); and (b) a homemade "bond" promising the

Court its share in the $20,000.00-plus-2%-interest payment on June 26, 2013, such "creativity"

suggests only mockery of the Court rather than suitability for IFP status.

This Court agrees with Judge Simandle's observation that explaining to Murakush-

Amexem and its members the basics of IFP analysis is superfluous at this juncture: the same

explanation was already provided to them nine times over by the judges from the Southern

District of Florida ("S.D. Fla."), Judge Simandle, Judge Gibney and Judge Robinson.  Moreover,

Judge Robinson recently re-explained to Murakush-Amexem and its members that they cannot

proceed IFP in their Delaware Action-III and that no "bond" can be offered in lieu of a valid

payment.[22]

**B.      MURAKUSH-AMEXEM CANNOT PROCEED IN A LITIGATION PRO SE AND IT CANNOT QUALIFY FOR PRO BONO REPRESENTATION**

Analogously, it appears that another explanation of why a juridical entity cannot proceed

in a legal matter pro se would be superfluous in this action, since the same point was already

explained and re-explained to those Murakush-Amexem's members who signed the Complaint at

bar (and the complaint in Caliphate) eight times over, first by the S.D. Fla. and Judge Robinson,

and then by Judge Simandle, and then again by Judge Robinson.  The same applies to Murakush-

Amexem's application seeking pro bono legal representation: as Judge Simandle already

explained, no juridical entity can qualify as pauper under Section 1915, under any set of

circumstances, and thus it cannot ever qualify for appointment of pro bono counsel, see United

States v. McQuade, 647 F.2d 938, 940 (9th Cir. 1981), cert. denied, 455 U.S. 958 (1982).

Therefore, the Complaint will be dismissed as not submitted by a duly admitted attorney,

see Local Civil Rule 11.1; Rowland, 506 U.S. at 202, and Murakush-Amexem's application for

appointment of pro bono counsel will, too, be denied; such denial will be with prejudice.

---

[22]  Moreover, the Court stresses that there is no statutory provision for proceeding
"without prepayment of filing fee" except for the IFP statute, that is, 28 U.S.C. § 1915, which:
(a) speaks only in terms of a *natural person*, i.e., a human being, not juridical entity; and (b) does
not envision promises by IFP-ineligible individuals to pay some day in the future.   See Rowland
v. California Men's Colony, 506 U.S. 194 (1993) (only a natural person may proceed without
prepayment of fee under Section 1915).  Therefore, any Murakush-Amexem's exercises in
semantics would only play against its interests, since any assertion that the entity is "kind of" not
seeking IFP status results in invocation of a non-existent legal provision.

### C.    COMPLAINT FAILS TO MEET REQUIREMENTS OF RULES 18 AND 20

One more point requiring no re-explanation by this Court is Murakush-Amexem's obligation to comply with the requirements of Rules 18 and 20 of the Federal Civil Procedure that mandate presence of a transactional relationship between the claims and, in addition, set forth limitations on joinder of defendants.  This aspect was already extensively detailed to the signatories of the Complaint by Judge Simandle in his Marrakush-Opinion.  See Marrakush Soc'y, 2009 U.S. Dist. LEXIS 68057, at *105-09 (thoroughly detailing the workings of both Rules, explaining that the analysis under Rule 20 precedes that under Rule 18, pointing out the guidance provided in Neitzke v. Williams, 490 U.S. 319, 328 (1989), quoting Charles Allen Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice & Procedure Civil 3d § 1655, and replicating the clear example set forth in George v. Smith, 507 F. 3d 605, 607 (7th Cir. 2007), i.e., the decision spelling out why "buckshot" complaints violate the Rules and filing fee statute). And yet, the Complaint at hand presents, literally, a diary covering the period of more than three years and asserts a gamut of wholly unrelated transactions involving a multitude of different persons designated as wrongdoers and a matching multitude of persons designated as aggrieved. Simply put, the Complaint is nothing but a journal of notes reflecting occurrences that happened, during this three-year period, with certain members of Murakush-Amexem and with their acquaintances.  "To put the [span] of this record in perspective, [it is much like a Murakush version of] Leo Tolstoy's 'War and Peace.'"  Mann v. GTCR Golder Rauner, L.L.C., 483 F. Supp. 2d 884, 891 (D. Ariz. 2007).

Since the Complaint facially fails to comply with the requirements of Rules 18 and 20, it is also subject to dismissal on these grounds.

### D.    MURAKUSH-AMEXEM CANNOT OBTAIN <u>JUS</u> <u>TERTII</u> STANDING

Another point that does not require one more round of recital is the standing-to-sue aspect.  Judges from the S.D. Fla. and Judge Simandle's Marrakush-Opinion already extensively detailed to Murakush-Amexem's members the concept of standing to sue and the two-prong test articulated by the Supreme Court in <u>Whitmore</u>, 495 U.S. at 154-55, and – in addition – Judge Gibney recently repeated the same in the <u>Virginia Action</u>.  Yet, the Complaint states a panoply of challenges associated solely with searches, arrests, detentions, incarcerations and prosecutions of M.K., K.C., K.S., El, Bey, which have absolutely nothing to do with the business operations of Murakush-Anexem, that is, presuming that such operations are altogether present.   Murakush-Amexem is a wholly autonomous, independent juridical entity, and it cannot be used as a "front" by M.K., K.C., K.S., El, Bey and their companions.[23]

Since, under the <u>Whitmore</u> test, the Court cannot find Murakush-Amexem truly dedicated to the best interests of M.K., K.C., K.S., El and Bey, and it has no bases to find that these persons and other individuals mentioned in the Complaint lack mental competence or suffer of analogous disabilities that render these persons unable to prosecute their own individual claims, the Complaint will be dismissed for lack of standing.

Such dismissal as to the claims of the others will be with prejudice, since Murakush-Amexem's lack of standing seems unamenable to a factual change.

---

[23]   The fact that M.K., K.C., K.S., El, Bey and their companions gave themselves titles in Murakush-Amexem or own shares in Murakush-Amexem (or believe that they own such shares) does not transform Murakush-Amexem into their "alter ego."  Moreover, if such transformation takes place, Murakush-Amexem cannot be deemed a <u>bona fide</u> juridical entity, since M.K., K.C., K.S., El and Bey's actions causing a <u>de facto</u> equation of Murakush-Amexem with themselves would necessarily strip Murakush-Amexem of its corporate identity, piercing its "corporate veil."

E.      ORDERS OF PRECLUSION

As the foregoing discussion illustrates, the Complaint at bar is subject to dismissal on various grounds, and some of these grounds warrant dismissal with prejudice.  However, a mere resolution of the issues presented by the Instant Matter appears insufficient without this Court addressing the overall pattern of vexatious litigation practices adopted by the Complaint signatories, other members/"officers" of Murakush-Amexem and their associates.

Two years ago, at the closure of his Marrakush-Opinion, Judge Simandle warned – in no ambiguous terms – M.K., K.S., Bey and their associates as follows:

> The Court expressly warns the Plaintiffs that any future abuse of legal process (be it with regard the [Marrakush Society Cases] currently before the Court or with regard to any other action the Plaintiffs commence in this District) would trigger sanctions and/or an imposition of severe limitations on the ability to file a case in the future.

Marrakush Soc'y, 2009 U.S. Dist. LEXIS 68057, at *134.

As the submissions at bar and those docketed in Caliphate, Delaware Action-III and Virginia Action indicate, M.K., K.S., K.C., El, Bey and their associates failed to take Judge Simandle's warning seriously.  This was a mistake.  "The courts in this nation stand ready to address challenges brought by litigants in good faith. Which, in turn, means that the judiciary – including the Judges in this District – expect litigants to treat their litigation with utmost seriousness, without abusing legal process and without unduly testing of the resolve or common sense of the judiciary."  In re Telfair, ___ F. Supp.2d ___; 2010 U.S. Dist. LEXIS 110681, at *130 (D.N.J. Oct. 15, 2010).

> Th[is] Court does not know why [M.K., K.S., K.C., Bey, El, etc.] have chosen to file [their] labyrinthine, multi-defendant . . . actions in federal court[s] over the years, or why they have elected to file [the Instant Matter, Caliphate and Delaware

Action-III papers] in the last few weeks.  What the Court does know is that many of these actions appear frivolous on their face, and all have been filed at no cost to [these litigants] (given that they have not retained counsel, have not paid filing fees, and in most cases have . . . filed [facially insufficient, mockery-of-the-court-like] IFP petitions).  In stark contrast to the numerous free rides through the federal judicial system that [these litigants have been] enjoying, their litigiousness has exacted and will continue to exact a heavy price on the finite resources of this District Court [and other federal courts at district level] and, hence, on litigants in other matters as to whom justice will be delayed while those scarce [judicial] resources are expended to process [M.K., K.S., K.C., Bey and El's] bounty.  See Miller v. Donald, 541 F.3d 1091, 1096 (11th Cir. 2008) ("Frivolous and vexatious law suits threaten the availability of a well-functioning judiciary to all litigants"); Procup v. Strickland, 792 F.2d 1069, 1072 (11th Cir. 1986) (en banc) ("Every lawsuit filed, no matter how frivolous or repetitious, requires the investment of court time, whether the complaint is reviewed initially by a law clerk, a staff attorney, a magistrate, or the judge").  The undersigned will [not] sit idly by as this District Court is inundated with . . . harassing and vexatious litigation arising from whatever [M.K., K.S., K.C., Bey and El's] perceived multimillion-dollar constitutional affront du jour might be.

Bethel v. Bosch, 2010 U.S. Dist. LEXIS 128065, at *13 (S.D. Ala. Dec. 2, 2010).

Since it has become apparent to the Court that M.K., K.S., K.C., Bey, El and their associates: (a) refused to heed to good faith guidance provided to them by Judge Simandle and by federal judges in other district courts; and (b) are either intentionally unwilling or simply unable to control their abusive litigation practices[24] and resulting impulses to manufacture frivolous submissions, "this Court, in exercise of its supervisory discretion, finds it necessary to enter . . . limited order[s] of preclusion that [would] help [these litigants] to . . . carefully and thoughtfully

_____

[24]

The term "abuse of process" implies a litigant's improper use or perversion of legal process through actions undertaken for the purpose other than that intended by the law to effect, . . . the concept of "abuse of process" differs from that of "malicious prosecution" in resting upon an improper use of regularly issued process, rather than upon a wrongful issuance of process.

Telfair, __ F. Supp. 2d at ___; 2010 U.S. Dist. LEXIS 110681, at *130, n. 38 (citations omitted).

select [their] claim[s] . . . and reduce these claims to clear and concise statements free from [the

inclusions] that reduce[] the value of [their] submissions."[25]   Telfair, __ F. Supp. 2d at ___;

2010 U.S. Dist. LEXIS 110681, at *144 (citations omitted); see also Miller, 541 F.3d at 1096

("Conditions and restrictions on each person's access are necessary to preserve the judicial

resource for all other persons"); Procup, 792 F.2d at 1073-74 (pursuant to both inherent powers

and constitutional obligations, courts have the "responsibility to prevent single litigants from

unnecessarily encroaching on the judicial machinery needed by others").

"The aforesaid conclusion presents this Court with the task of: (a) tailoring the means to

control [M.K., K.S., K.C., Bey, El and their corporations'] abuses of legal process, while (b)

preserving [these private individuals'] ability to litigate meritorious claims in the event [these

individuals] develop[] both such claims and a desire to litigate them in good faith, i.e., by

complying with the requirements posed by the Rules of Civil Procedure and the substantive tests

governing those claims." Hoffenberg v. Grondolsky, 2011 U.S. Dist. LEXIS 3786, at *82

(D.N.J. Jan. 14, 2011).

---

[25]

Ideally, the existence of non-trivial case filing fees serves as a barrier to entry that
"discourage[s] frivolous lawsuits and thus help[s] allocate judicial resources to more
meritorious cases." Miller, 541 F.3d at 1096. But these kinds of financial incentives are
absent in a case such as this, where the [litigants] are claiming inability to pay filing fees
and promising to submit [a payment] at some unspecified future date. The resulting
distortion of incentives is a problem. After all, "[i]f engaging in litigation is a pleasurable
sport with no costs, then the chronic recreational litigant has no incentive to restrict his
abusive behavior." Jones v. Warden of Stateville Correctional Center, 918 F. Supp. 1142,
1155; see also Miller, 541 F.3d at 1096 ("Absent monetary cost as a constraint, the sheer
volume of frivolous IFP suits threatens to undermine the availability of the federal courts
to the public").

Bethel, 2010 U.S. Dist. LEXIS 128065, at *16-17.

### 1.    Unique Circumstances Underlying the Instant Orders of Preclusion

The history of the Estate Case, Marrakush Society Cases and other district cases detailed

in the Marrakush-Opinion, as well as the contents of submissions made in the Instant Matter,

Califate, Virginia Action and Delaware Action-III indicate that this Court faces an apparent

challenge in tailoring appropriate orders of preclusion against M.K., K.S., K.C., Bey, El, their

actual and imaginary juridical entities and their associates (hereinafter, collectively, the

"Murakush Group").  This challenge ensues from these individuals' practice of:

a.    proliferating existing and illusory juridical entities at the speed far exceeding any court's

ability to process submissions received;

b.    fashioning flocks of names for their mushrooming creations, with some of these names

sounding alike, e.g., "Murakush"-"Marrakush"-"Marankokush," see Docket Entry No. 1

and Marrakush Opinion (providing examples), and others sounding entirely

different/unrelated, e.g., "Imperial Temple," "Intercontinental Union,"

"Moorish-al-Marikanos Corporation," "Timbuctoo Territory," "Samal Shariq Region,"

"Indigenous Land," "Aboriginal Law Firm," etc., see id., see also Delaware Action-III;

and

c.    producing mile-long self-granted title-like "attributes" at the same lightning speed, see id.

Docket Entry No. 1 and Marrakush Opinion (reflecting such "attributes" as "Universal

Supreme Allah," "Minister Plenipotentiary High Priest Noble Æmer," "Divine Minister

Plenipotentiary Noble Æmer," "Sheik Shaman," "High Priestess Æmpress," "Caliph,"

"Shaikhess Financial Officer," etc.), while garnishing these attributes with a mere handful

of letters, like "M.K." and "K.C.," or just with "Bey" or "El" suffixes, all of which are

insufficient for the purpose of clear identification of the actual persons hiding behind such smoke-and-mirrors.

In light of these chameleonic qualities of business names and "attributes" produced by the Murakush Group, the Court recognizes that any order of preclusion aiming to guard against abusive litigation practices of these individuals would be effective, enforcement-wise, only if it is set forth in flexible terms allowing the Clerk's Office personnel and/or judges in this District a swift check as to applicability of such order(s) of preclusion to the cases that would be commenced in the future.

### 2.     Reference to the Barbary Treaties Is a Unique Identifying Feature

While discussion of substantive validity/invalidity of constitutional challenges raised in the Complaint at bar falls outside the scope of the Court's inquiry in the Instant Matter, one substantive issue appears so pertinent to the analysis at hand that it warrants resolution.  This unique issue spurs from a single feature present virtually in every submission made by the Murakush Group: this feature is the litigants' nearly invariable general invocation of the Barbary Treaties (and, specifically, of the Treaty of Morocco) in the context of challenging their searches, arrests, confinements, criminal proceedings, bails, fees, convictions, etc. that took place entirely within the United States territory and were effectuated by the law enforcement and judicial officers of the States of New Jersey, Delaware, Virginia, Florida, etc.[26]

All provisions of the Treaty with Morocco are, however, wholly inapposite to the type of challenges – known within in federal litigation practice as "prisoners' litigation" – that were

---

[26] Although the Murakush Group's submissions invariably refer to the Barbary Treaties, as a collective, the exact text and context of these references indicates the litigants' interest in invoking solely the Treaty with Morocco.

raised by the Murakush Group over the years and are now at bar.  As noted supra, the Treaty with

Morocco was executed, as all Barbary Treaties, with the aim to: (a) eliminate, or at least curtail,

the ill of piracy plaguing the coastal waters and ports of the post-medieval North African geo-

political bodies; and (b) eliminate, or at least halt the rise of, the fees charged by the rulers of

these geo-political bodies to the then-developing American merchantry for keeping "peace" in

the ports and coastal waters subject to their dominion.  See Frank Lambert, The Barbary Wars:

American Independence in the Atlantic World (2007).  It is, therefore, hardly surprising that the

bulk of the provisions of the Barbary Treaties: (a) focused on the issues of maritime/admiralty,

war, merchant purchases/sales and akin matters; and (b) were set forth in terms of protections of

"vessels."[27]

       This is particularly obvious in the Treaty with Morocco, a short accord consisting of mere

twenty-five Articles, with only three Articles addressing not on acts of war, vessels, merchant

activities, etc. but other acts against human beings.  See 1836 U.S.T. LEXIS 10, arts. 6, 20 and

21.  These three Articles read:

---

    [27] The use of the term "vessel" by the bulk of Articles of the Barbary Treaties seemingly
prompted the Moorish Group to "creatively" refer to themselves and/or to their bodies/torsos as
"vessels," using such phrases as "solar vessel," "divine vessel," "foreign vessel," etc., seemingly
in hope to tie the Treaties to their life persons.  This curious semantical ploy, however, cannot
transform those Articles of the Barbary Treaties that were set forth in terms of "vessels" into
provisions applicable to natural human beings, since the context of each one of these Treaties
unambiguously indicates that the term "vessel" could, did and does apply only to non-human
crafts designed for navigation on water (or, in the context of modern technologies, perhaps to
non-human crafts designed for navigation in or on water, as well as on coastal lands and/or air).
No Article in the Barbary Treaties, including in the Treaty with Morocco – so long as a particular
Article speaks in terms of a "vessel" – can possibly be invoked in any habeas or civil rights claim
addressing the issues of arrest, detention, incarceration, bailing, prosecution, conviction, etc. of
any human being, regardless of where these transactions are conducted.  See, e.g., The Nereide,
13 U.S. 388 (1815) (detailing the nature of potentially viable "vessel" claims); Henfield's Case,
11 F. Cas. 1099 (C.C.D. Pa. 1793) (same).

Article 6.     If any Moor shall [obtain physical control over and] bring citizens of the United States[] or their [possessions] to [the Kingdom of Morocco], the[se United States] citizens shall immediately be set [free] and the[ir possessions shall be] restored [to them. Analogously], if any Moor [who is] not a [citizen of Morocco], shall [obtain physical control over] any . . . citizens of [the United States] or their [possessions] and bring the[se United States citizens] into any of the ports of [the Kingdom of Morocco,] the[se United States citizens] shall be immediately released [and, moreover, they shall] be considered . . . under [the personal] protection [of the King of Morocco].

Article 20.     If any of the citizens of the United States, or any persons under their protection, shall have any dispute with each other [while being situated in the Kingdom of Morocco], the [United States] Consul shall [act as a tribunal and] decide between the parties . . . .

Article 21.     If a citizen of the United States should kill or wound a Moor . . . , the law of the Country[, <u>i.e.</u>, the United States[28]] shall take place, and equal justice shall be rendered [during proceedings held in the Kingdom of Morocco, to both United States citizens and Moors, and] the [United States] Consul assisting at the trial . . . .

<u>Id.</u>

None of these three Articles could be read as applying to habeas or civil rights claims

raised by the Murakush Group against state police or prosecutorial officers, or judges, or to the

claims based on the Murakush Group's arrests, incarceration, bailing, prosecution, convictions,

etc. <u>See</u>, <u>e.g.</u>, <u>Seals-Bey v. Cross</u>, 2010 U.S. Dist. LEXIS 87794 (N.D. W. Va. July 23, 2010)

("the Treaty of Morocco offers no grounds for relief" to the litigant who raised "prisoners'-

litigation"-like claims challenging the litigant's conviction on the grounds of his self-proclaimed

---

[28] The Treaty with Morocco, being an ancient accord, does not contain a specific Article containing a definition of the term "Country." However, the context of the Treaty makes the meaning of the term abundantly clear, since all references to the sultanate of Morocco, as a geo-political body, are made in terms of "our Country," with possessive pronoun "our" invariably preceding the noun "country." This mode of reference indicates that the term "Country," used without possessive pronoun "our," refers to the United States.

"Moorish" nationality, his assertions that he is not a United States citizen and his allegations that

he was "improperly designated as the res" because his criminal proceedings were conducted

while referring to him under his actual name rather than under his self-fancied "attribute").

Indeed, Article Six of the Treaty was fashioned to prevent undue enslaving of American

citizens (and also to prevent theft of American citizens' goods) in the Mediterranean by pirating

Moors who were either of Morrocan or of non-Morrocan domicile and who were taking undue

advantage of the passage ways, trade, accommodations, etc. in Moroccan coastal waters and

ports.  This Article is facially inapplicable to the Murakush Group, since their arrests, searches,

criminal proceedings, incarcerations, etc. did not occur anywhere near the coastal waters and

ports of the Kingdom of Morocco and, to top it all off, these arrests, searches, criminal

proceedings, incarcerations, etc. were *not* conducted by "Moors."[29]  See Thomas H. Lee, The

Safe-Conduct Theory of the Alien Tort Statute, 106 Colum. L. Rev. 830, 876 (2006) (under the

"Treaty with Morocco, . . . the locus of the [T]reaty partners' interaction [was] confined to the

Mediterranean and therefore not within the [geographical] jurisdiction of the United States");

accord Pitt-Bey v. District of Columbia, 942 A.2d 1132 (D.C. 2008) (a self-proclaimed

"Moorish" minister has no diplomatic immunity protection from criminal proceedings conducted

within the United States territory).

Analogously, Articles Twenty and Twenty-One of the Treaty are facially inapplicable to

the Murakush Group, since they had no right to consular assistance, and no United States citizen

killed or wounded them in the Mediterranean: they were arrested, searched, detained, criminally

---

[29]  Moreover, since members of the Murakush Group keep insisting that they are not
United States citizens, the Article Six has another reason not to have any relevance to them.

prosecuted, bailed, etc. well within the borders of the United States, and – in any event - equal justice was already available to them under the safeguards of the Fourteenth Amendment's Equal Protection Clause.[30]  See United States v. Casey, 2005 U.S. Dist. LEXIS 39785 (E.D. Mo. July 21, 2005) (the decision to criminally prosecute a self-declared "Moor" is constitutionally independent of any consular interest in assistance) (citing United States v. Ortiz, 315 F.3d 873, 886 (8th Cir. 2002); United States v. De La Pava, 268 F.3d 157, 165-66 (2nd Cir. 2001); United States v. Emuegbunam, 268 F.3d 377, 391-94 (6th Cir. 2001); United States v. Lombera-Camorlinga, 206 F.3d 882, 885-86 (9th Cir. 2000); United States v. Cordoba-Mosquera, 212 F.3d 1194, 1195-96 (11th Cir. 2000)).

Consequently, all "prisoners'-litigation"-like claims challenging any events associated with arrests, searches, detention, incarceration, prosecution, conviction, etc. that occur within the United States' actual geographical territory (and, especially, if these events involved individuals who reside within that territory) cannot possibly implicate *any* provision of the Treaty with Morocco.  Therefore, all such "prisoners'-litigation"-like claims invoking the Barbary Treaties, either collectively or individually, are necessarily frivolous which, in turn, means that any pleading asserting such claims is not bona fide.[31]

_____

[30] Moreover, since members of the Murakush Group keep insisting that they are not United States citizens, Articles Twenty cannot possibly have no relevance to them, since the Article focuses solely on interactions between United States citizens.

[31] In the event the Murakush Group disagrees with this Court's reading of the Barbary Treaties or the Treaty with Morocco, the Murakush Group shall not seek this Court's reconsideration.  Disagreement with the district court's decision is an inappropriate ground for a motion for reconsideration: such disagreement should be raised through the appellate process. See Assisted Living Associates of Moorestown, L.L.C., v. Moorestown Tp., 996 F. Supp. 409, 442 (D.N.J. 1998) (citing Bermingham v. Sony Corp. of America, Inc., 820 F. Supp. 834, 859 n.8 (D.N.J. 1992), aff'd, 37 F.3d 1485 (3d Cir. 1994); G-69 v. Degnan, 748 F. Supp. 274, 275

[I]t is well-recognized . . . that such organizations as the Moorish American Nation and [similar imaginary creations, like] the Nation of Washitaw, are:

> notorious organization[s] of scofflaws and ne'er-do-wells who attempt to benefit from the protections of federal and state law while simultaneously proclaiming their independence from and total lack of responsibility under those same laws.  Sanders-Bey v. United States, 267 F. App'x 464, 466 (7th Cir.2008) (finding that "the Washitaw Nation . . . is not recognized by the United States government"); Bybee v. City of Paducah, 46 F. App'x 735, 736-37 (6th Cir.2002) (finding that the "Nation of Washitaw" is "fictional"); United States v. Gunwall, 1998 U.S.App. LEXIS 18596, at *11 (10th Cir. Aug. 12, 1998) (rejecting claim that the court had no jurisdiction over a member of the Washitaw as "frivolous"); Bey v. Louisiana, 2008 U.S. Dist. LEXIS 91606 (W.D. La. July 11, 2008) (finding that plaintiff's claim to land as a member of the Washitaw was "patently frivolous" and rested on documents of "dubious legal significance"); Great Seal Nat'l Ass'n of Moorish Affairs v. 46th Dist. Ct. of Oakland County, 2007 U.S. Dist. LEXIS 3199, at *2 (E.D. Mich. Jan. 17, 2007) (dismissing claim that plaintiffs owned several parcels of property by virtue of their Moorish ancestry as "baseless, fantastic and delusional" and finding the complaint to be "indecipherable"); Khattab El v. U.S. Justice Dep't, 1988 U.S. Dist. LEXIS 544, at *5 (E.D. Pa. Jan. 22, 1988) (holding that "the United States has not recognized the sovereignty of the Moorish Nation, thus precluding sovereign immunity claims").

El-Bey v. United States, 2009 U.S. Dist. LEXIS 33838 (M.D.N.C. Jan. 26, 2009). Any claims or arguments raised by Plaintiff which are based on his membership in the Moorish American Nation are [by definition] frivolous.

Hampton v. City of Durham, 2010 U.S. Dist. LEXIS 100255, at *6-8 (M.D.N.C. Sept. 22, 2010).

### 3.    Preclusion Orders as to Juridical Entities of the Murakush Group

In light of the foregoing conclusions, two orders of preclusion will be entered against the

juridical entities appearing to be products of either fantasy of or actual registration by the

Murakush Group.

---

(D.N.J. 1990)); see also Drysdale v. Woerth, 153 F. Supp. 2d 678, 682 (E.D. Pa. 2001) (a motion for reconsideration may not be used as a means to reargue unsuccessful theories).  Therefore, if the Murakush Group disagrees with this Court's reading of the Barbary Treaties or the Treaty with Morocco, their sole remedy is appeal to the Court of Appeals for the Third Circuit.

### a.       Submissions Purporting to Appear as Counseled Applications

Since: (a) the pleading submitted in the Marrakush Society Cases (and in many other

district courts actions commenced by the Murakush Group) were so fashioned as to create

impression of "counseled" actions filed by the "Aboriginal Law Firm"; and (b) the Murakush

Group's registrations in the State of Colorado recently generated six new corporations, one being

expressly titled the "Murakush Law Firm," it appears likely that the Murakush Group could

initiate new actions in the future by submitting voluminous, incomprehensible/nonsensical

packages purporting, nonetheless, to appear prepared by counsel duly admitted to practice in this

District.  Therefore,

1.       in the event the Clerk receives any submission which:

    a.       names, as the plaintiff/petitioner (or as one of plaintiffs/petitioners) a juridical

            entity containing, as part of its name, such words or phrases as "Moorish" and/or

            "Marrakush" and/or "Murakush" and/or "Marankokush" and/or  "Marikanos"

            and/or "Al-Maricanos" and/or "Timbuctoo" and/or "Samal Shariq" and/or

            "Indigenous" and/or "Aboriginal" and/or any similarly sounding concoction,

            and/or

    b.       refers, in its body, to the "Barbary Treaties" and/or the "Treaty with Algiers"

            and/or the "Treaty with Tripoli" and/or the "Treaty with Tunis" and or the "Treaty

            with Morocco" and/or "Treaties of 1795-1836" and/or any "Treaty" dated at any

            date falling within the period from 1795 to 1836  and/or any "Treaty" dated at any

            date falling within the period from 1215 to 1258 (which might be indicative of use

of Hijri dates instead of Gregorian calendar dates) (hereinafter, collectively, the "Treaties"),

*and*

c.    identifies, as counsel for that plaintiff/petitioner either:

    (i)    a "generic" law firm (meaning, providing a designation which omits the identity of a specific attorney, by name, phone number, business mailing and email addresses), or

    (ii)    a specific "attorney" whose admission to practice in this District cannot be readily established by the Clerk through a reference to the Lawyers Diary or a similar hard-copy or online resource,

2.    the Clerk shall:

a.    open a new matter and scan into the docket, as "Docket Entry No. 1," the entire submission received, but only if the volume of such submission is equal to or less than fifteen pages, single-sided, or

b.    open a new matter and scan into the docket, as "Docket Entry No. 1," only the first three pages of the submission received, if the volume of such submission exceeds fifteen pages, single-sided, and accompany such scan by the docket text reading "SUBMISSION RECEIVED EXCEEDS FIFTEEN PAGES.  HARD COPY OF THE SUBMISSION IS ON FILE WITH THE CLERK,"

and

c.    docket a copy of this Opinion as "Docket Entry No. 2," accompanying that docket entry with the docket text reading "OPINION DETAILING THE BASES AND

THE SCOPE OF PRECLUSION APPLIED TO THIS MATTER, PURSUANT

TO THE ORDER ENTERED IN CIVIL ACTION No. 11-1317,"

and

d.      make a new and separate docket entry, reading "PURSUANT TO THE ORDER

OF PRECLUSION ENTERED IN CIVIL ACTION No. 11-1317, THIS MATTER

IS ADMINISTRATIVELY TERMINATED, SUBJECT TO REOPENING UPON

RECEIPT BY THE CLERK, WITHIN THIRTY DAYS FROM THE DATE OF

ENTRY OF THIS NOTATION, A ONE-PAGE WRITTEN STATEMENT

FROM COUNSEL REPRESENTING THE PLAINTIFF(S)/PETITIONER(S),

DETAILING COUNSEL'S NAME, BUSINESS AND EMAIL ADDRESSES,

TELEPHONE NUMBER AND INCLUDING A VERIFICATION OF

COUNSEL'S DUE ADMISSION TO PRACTICE IN THIS DISTRICT.  NO

OTHER SUBMISSION RECEIVED, EXCEPT FOR A NOTICE OF APPEAL

EQUAL IN VOLUME TO FIVE SINGLE-SIDED PAGES OR LESS, WILL BE

DOCKETED IN THIS MATTER UNTIL AND UNLESS COUNSEL'S DUE

ADMISSION IS ESTABLISHED.  IN THE EVENT ANY OTHER

SUBMISSION IS RECEIVED IN THIS MATTER, SUCH SUBMISSION WILL

NOT BE DOCKETED AND WILL BE RETURNED TO THE SENDER BY

REGULAR U.S. MAIL.  ANY NOTICE OF APPEAL EQUAL IN VOLUME TO

FIVE PAGES OR LESS WILL BE FORWARDED TO THE COURT OF

APPEALS TOGETHER WITH A COPY OF THE OPINION DOCKETED IN

CIVIL ACTION No. 11-1317,"[32]

and

e.      administratively terminate this new matter, without assigning it to any judge in

this District, and designating that matter as "unassigned," and

f.      mail, by regular U.S. mail, a copy of the docket sheet created in that matter,

together with a copy of this Opinion, to the address, if any, designated in the

submission received,

and

g.      upon timely receipt of a written statement indicating, either clearly or with a

reasonable degree of certainty, that the action was initiated with assistance of

counsel duly admitted in this District, docket such written statement and assign

this matter to a judge in this District in accordance with the Local Civil Rules, or

h.      in the event a written statement received fails to indicate, either clearly or with a

reasonable degree of certainty, that the action was initiated with assistance of duly

admitted counsel, docket the first page of such written statement and make a new

and separate entry on the docker reading, "THIS MATTER IS CONCLUSIVELY

CLOSED FOR FAILURE TO ESTABLISH COUNSEL'S DUE ADMISSION,"

and

---

[32]   This Court expresses no opinion as to substantive or procedural propriety of such appeal, if filed, or as to any sanctions that the Court of Appeals might elect to impose in connection with such filing.  The Court, however, stresses that such appeal cannot be prosecuted without prepayment of filing fee and, if an IFP appeal is attempted, it would be facially frivolous.

i.      close the file on that matter and mail, by regular U.S. mail, a copy of the so-updated docket sheet, titling it "THIS IS THE LAST AND FINAL MAILING SENT IN THIS MATTER," to the address designated in the written statement or, if such is not provided, to the address designated in the original submission.

**b.      Submissions Made <u>Pro Se</u> by Juridical Entities**

Since the pleading submitted in the <u>Instant Matter</u>, <u>Caliphate</u>, <u>Delaware Action-III</u>, <u>Virginia Action</u> (and in some other district court actions commenced by the Murakush Group) were made <u>pro se</u> on behalf of juridical entities either actually registered or simply fathomed by the Murakush Group (and were typically accompanied by natural persons' applications seeking to proceed IFP), it appears likely that the Murakush Group could initiate new actions in the future by submitting analogous <u>pro se</u> packages with juridical entities named as or among plaintiff(s)/petitioner(s). Therefore,

1.      in the event the Clerk receives any submission which:

      a.      names, among the plaintiff(s)/petitioner(s), a juridical entity containing, as part of its name, such words or phrases as "Moorish" and/or "Marrakush" and/or "Murakush" and/or "Marankokush" and/or "Marikanos" and/or "Al-Maricanos" and/or "Timbuctoo" and/or "Samal Shariq" and/or "Indigenous" and/or "Aboriginal" and/or any similarly-sounding concoctions, and/or

      b.      refers, in its body, to the Treaties,

    and

      c.      indicates that all plaintiffs/petitioners are juridical entities proceeding <u>pro se</u>,

2.      the Clerk shall:

a.      open a new matter and scan into the docket, as "Docket Entry No. 1," the entire submission received, but only if such submission is equal to or less than fifteen pages, single-sided, or

b.      open a new matter and scan into the docket, as "Docket Entry No. 1," only the first three pages of the submission received, if the volume of such submission exceeds fifteen pages, single-sided, and accompany such scan by the docket text reading "SUBMISSION RECEIVED EXCEEDS FIFTEEN PAGES.  HARD COPY OF THE SUBMISSION IS ON FILE WITH THE CLERK,"

and

c.      docket a copy of this Opinion as "Docket Entry No. 2," accompanying that docket entry with the docket text reading "OPINION DETAILING THE BASES AND THE SCOPE OF PRECLUSION APPLIED TO THIS MATTER, PURSUANT TO THE ORDER ENTERED IN CIVIL ACTION No. 11-1317," and

d.      make a new and separate docket entry, reading "PURSUANT TO THE ORDER OF PRECLUSION ENTERED IN CIVIL ACTION No. 11-1317, THIS MATTER IS ADMINISTRATIVELY TERMINATED, SUBJECT TO REOPENING UPON RECEIPT BY THE CLERK, WITHIN THIRTY DAYS FROM THE DATE OF ENTRY OF THIS NOTATION, APPEARANCES OF COUNSEL, DETAILING COUNSEL'S NAME, BUSINESS AND EMAIL ADDRESSES, TELEPHONE NUMBER AND INCLUDING A VERIFICATION OF COUNSEL'S DUE ADMISSION TO PRACTICE IN THIS DISTRICT.  NO OTHER SUBMISSION RECEIVED, EXCEPT FOR A NOTICE OF APPEAL EQUAL IN VOLUME TO

FIVE SINGLE-SIDED PAGES OR LESS, WILL BE DOCKETED IN THIS

MATTER UNTIL AND UNLESS COUNSEL MAKES DUE APPEARANCES.

IN THE EVENT ANY OTHER SUBMISSION IS RECEIVED IN THIS

MATTER, SUCH SUBMISSION WILL NOT BE DOCKETED AND WILL BE

RETURNED TO THE SENDER BY REGULAR U.S. MAIL.  ANY NOTICE OF

APPEAL EQUAL IN VOLUME TO FIVE PAGES OR LESS WILL BE

FORWARDED TO THE COURT OF APPEALS TOGETHER WITH A COPY

OF THE OPINION DOCKETED IN CIVIL ACTION No. 11-1317," and

e.     administratively terminate this new matter, without assigning it to any judge in

this District, and designating that matter as "unassigned," and

f.     mail, by regular U.S. mail, a copy of the docket sheet created in that matter,

together with a copy of this Opinion, to the address, if any, designated in the

submission received,

and

g.     upon timely receipt of documents indicating, either clearly or with a reasonable

degree of certainty, proper appearances of counsel duly admitted in this District,

docket these documents and assign this matter to a judge in this District in

accordance with the Local Civil Rules, or

h.     in the event the documents received fail to indicate, either clearly or with a

reasonable degree of certainty, proper appearances of counsel duly admitted in

this District, docket these documents (or, if the documents received exceed five

pages, single-sided, then scan into the docket only the first five pages of the

documents received) and make a new and separate entry on the docker reading,

"THIS MATTER IS CONCLUSIVELY CLOSED FOR FAILURE TO

ESTABLISH COUNSEL'S DUE ADMISSION," and

i.   close the file on that matter and mail, by regular U.S. mail, a copy of the so-

updated docket sheet, titling it "THIS IS THE LAST AND FINAL MAILING

SENT IN THIS MATTER," to the address designated in the written statement or,

if such is not provided, to the address designated in the original submission.

### 4.   <u>Preclusion Orders as to Natural Persons in the Murakush Group</u>

In addition to initiating, more often than not, actions on behalf of their actually registered

or imaginary juridical entities, the Murakush Group also occasionally initiated actions on behalf

of natural persons.[33]  Hence, it appears plausible that such actions will be filed in this District in

the future, and this Court's issuance of relevant orders of preclusion appears warranted.

### a.   Filing Amended Complaints in the *Marrakush Society Cases*

The bulk, although not the entire body, of the challenges raised in the <u>Instant Matter</u>

appear to relate to, restate/rehash the challenges raised in the <u>Marrakush Society Cases</u>.[34]  While

the Murakush Group's challenges raised in <u>Caliphate</u>, seeking remedy in the form of a

declaration that Judge Simandle is incompetent, senile and stripped of his judicial mandate, does

not indicate the Murakush Group's interest in filing amended complaints in the Marrakush

---

[33]  Any Murakush Group's complaints filed on behalf of quasi-juridical entities in the
form of "estates" of natural persons shall be subject to the preclusion orders applicable to the
Murakush Group's juridical entities.

[34]  Granted the obscurity and overwhelming breadth of the Marrakush Society Cases
challenges, the Court notes its uncertainty about this conclusion.

Society Cases, the Court finds it prudent to preserve the Murakush Group's right to litigate their challenges in good faith, and hence sets certain requirements – *solely as to the formatting and presentation aspects of the Murakush Group's submission of amended complaints* – in the Marrakush Society Cases, that is, if members of the Murakush Group elect to seek Judge Simandle's permission to make such submissions with a year-and-a-half delay.  Therefore,

1.      Any amended complaint filed in the Marrakush Society Cases shall:

    a.      be reduced to fifteen single-sided, double-spaced pages, unaccompanied by any "exhibits," "bonds," "cover letters," etc.; and

    b.      set forth a short and plain statement showing entitlement to relief on the basis of events pertaining directly and only to the natural person(s) named as plaintiff(s); and

    c.      state the name, street and post office address of each named plaintiff, without resorting to any self-made pseudonym or "attributes" in lieu of names and without designations of any geographic locales by self-generated names; and

    d.      comply with the requirements of Rules 18 and 20, as detailed in the Marrakush-Opinion; and

    e.      incorporate a clear and concise section explaining the factual bases for plaintiff(s') failure to file his amended complaint in timely fashion.  Such section shall be expressly titled "BASES FOR DELAYED FILING" (for easy identification) and

    f.      arrive together with:

        (i)      prepayment of filing fee, in the amount of $350.  Such prepayment shall be made only in the form of a personal or cashier check issued by an FDIC-

registered bank or in the form of a money order issued by an authorized

United States agency, e.g., the United States Postal Service;[35] or

(ii)     a duly executed application to proceed IFP, consisting solely of a completed

pre-printed form and, if applicable, of the plaintiff's prison account

statement covering the period of six months preceding the submission.

Such IFP application cannot be substituted by – or contain injections of –

any irrelevant rhetoric/narratives/plaintiff(s') opinions;

and

2.     in the event the Clerk receives such amended complaint(s), the Clerk shall:

a.     docket the submission(s)[36] received, but only if each such submission:

(i)     is in facial and strict compliance with the requirements detailed in (1)(a),

(1)(c), (1)(e) and (1)(f) of *this* preclusion order; and, in addition,

(ii)     does not contain, in its body, any references to the Treaties;

or

b.     if any submission received fails to meet the requirement set forth above, i.e., in

(2)(a) of *this* preclusion order:

---

[35]  Forged checks or money orders will be forwarded to prosecutorial offices for their determination of whether criminal prosecution based on such forged instruments is warranted.

[36]  This Court stresses that no statement made in this Opinion shall be construed as expressing this Court's position as to substantive or procedural validity or invalidity of the amended complaints that might be docketed in the Marrakush Society Cases pursuant to the terms of this limited preclusion order, or as to propriety of excusing such a delayed filing: all these and similar issues are subject solely to Judge Simandle's determination/discretion.

(i)     scan into the docket only the first three pages of the submission received

and accompany such docket entry with the docket text reading,

"SUBMISSION RECEIVED IS ON FILE WITH THE CLERK.

PURSUANT TO THE PRECLUSION ORDER ENTERED IN CIVIL

ACTION No. 11-1317, THIS ENTRY IS DEEMED STRICKEN FROM

THE DOCKET FOR FAILURE TO COMPLY WITH REQUIREMENTS

SET FORTH IN THAT ORDER AND IN JUDGE SIMANDLE'S

ABOVE-DOCKETED ORDER.  THE CONTENT OF THIS

SUBMISSION WILL NOT BE CONSIDERED BY THE COURT," and

(ii)    mail, by regular U.S. mail, a copy of the so-altered docket sheet to the

address, if any, designated in the submission.

### b.     Initiating New Actions Purporting to Appear Counseled

Since it is entirely plausible that members of the Murakush Group might file complaints

naming natural persons as the plaintiffs while asserting that these persons are represented by legal

counsel, and such "counsel" might be an entity not admitted to legal practice in this District, this

Court's omission of preclusion order as to such scenario bears the danger of creating an undue

loophole, opening this District to the Murakush Group's abuse of  legal process.  Thus,

1.      in the event the Clerk receives any submission which:

a.      names, as the plaintiff/petitioner a person whose name/designation includes such

words or phrases as "Moorish" and/or "Marrakush" and/or "Murakush" and/or

"Marankokush" and/or "Marikanos" and/or "Al-Maricanos" and/or "Universal

Supreme Allah,"  and/or "Minister Plenipotentiary" and/or "High Priest" and/or

"Noble Æmer," and/or "Divine Minister" and/or "Æmer," and/or "Sheik," and/or

"High Priestess" and/or "Æmpress" and/or "Caliph" and/or "Shaikhess" and/or any

similarly sounding concoction, and/or

b.    refers, in its body, to the Treaties,

*and*

c.    identifies, as counsel for the plaintiff(s)/petitioner(s) either:

(i)    a "generic" law firm (meaning, making a designation that omits to identify

a specific attorney, by name, phone number, business mailing and email

addresses), or

(ii)    a specific "attorney" whose admission to practice in this District cannot be

readily established by the Clerk through a reference to the Lawyers Diary or

a similar hard-copy or online resource,

2.    the Clerk shall:

a.    open a new matter and scan into the docket, as "Docket Entry No. 1," the entire

submission received, but only if the volume of such submission is equal to or less

than fifteen pages, single-sided, double-spaced, or

b.    open a new matter and scan into the docket, as "Docket Entry No. 1," only the first

three pages of the submission received, if the volume of such submission exceeds

fifteen pages, single-sided, double-spaced, and accompany such scan by the docket

text reading "SUBMISSION RECEIVED EXCEEDS FIFTEEN PAGES.  HARD

COPY OF THE SUBMISSION IS ON FILE WITH THE CLERK,"

and

c.      docket the copy of this Opinion as "Docket Entry No. 2," accompanying that

docket entry with the docket text reading "OPINION DETAILING THE BASES

AND THE SCOPE OF PRECLUSION APPLIED TO THIS MATTER,

PURSUANT TO THE ORDER ENTERED IN CIVIL ACTION No. 11-1317,"

and

d.      make a new and separate docket entry, reading "PURSUANT TO THE ORDER

OF PRECLUSION ENTERED IN CIVIL ACTION No. 11-1317, THIS MATTER

IS ADMINISTRATIVELY TERMINATED, SUBJECT TO REOPENING UPON

RECEIPT BY THE CLERK, WITHIN THIRTY DAYS FROM THE DATE OF

ENTRY OF THIS NOTATION, A ONE-PAGE WRITTEN STATEMENT FROM

COUNSEL  DETAILING COUNSEL'S NAME, BUSINESS AND EMAIL

ADDRESSES, TELEPHONE NUMBER AND INCLUDING A VERIFICATION

OF COUNSEL'S DUE ADMISSION TO PRACTICE IN THIS DISTRICT.  NO

OTHER SUBMISSION RECEIVED, EXCEPT FOR A NOTICE OF APPEAL

EQUAL IN VOLUME TO FIVE SINGLE-SIDED, DOUBLE-SPACED PAGES

OR LESS, WILL BE DOCKETED IN THIS MATTER UNTIL AND UNLESS

COUNSEL'S DUE ADMISSION IS ESTABLISHED.  IN THE EVENT ANY

OTHER SUBMISSION IS RECEIVED IN THIS MATTER, SUCH

SUBMISSION WILL NOT BE DOCKETED AND WILL BE RETURNED TO

THE SENDER BY REGULAR U.S. MAIL.  ANY NOTICE OF APPEAL

EQUAL IN VOLUME TO FIVE PAGES OR LESS WILL BE FORWARDED TO

THE COURT OF APPEALS TOGETHER WITH A COPY OF THE OPINION

DOCKETED IN CIVIL ACTION No. 11-1317,"

and

e.   administratively terminate this new matter, without assigning it to any judge in this

District, and designating that matter as "unassigned," and

f.   mail, by regular U.S. mail, a copy of the docket sheet created in that matter,

together with a copy of this Opinion, to the address, if any, designated in the

submission received,

and

g.   upon timely receipt of a written statement indicating, either clearly or with a

reasonable degree of certainty, that the action was initiated with assistance of

counsel duly admitted in this District, docket such written statement and assign this

matter to a judge in this District in accordance with the Local Civil Rules, or

h.   in the event a written statement received fails to indicate, either clearly or with a

reasonable degree of certainty, that the action was initiated with assistance of duly

admitted counsel, scan into the docket only the first page of such written statement

and make a new and separate entry on the docker reading, "THIS MATTER IS

CONCLUSIVELY CLOSED FOR FAILURE TO ESTABLISH COUNSEL'S

DUE ADMISSION," and

i.   close the file on that matter and mail, by regular U.S. mail, a copy of the so-

updated docket sheet, titling it "THIS IS THE LAST AND FINAL MAILING

SENT IN THIS MATTER," to the address designated in the written statement or,

if such is not provided, to the address designated in the original submission.

### c.    Initiating New Pro Se Actions

Finally, the Court now faces the task of fashioning a proper order of preclusion as to the

challenges, which the members of the Murakush Group might raise as natural persons proceeding

pro se.  A few considerations appear highly pertinent.  On one hand, this Court cannot exclude the

possibility that members of the Murakush Group might have developed – or might eventually

develop – constitutionally valid claims, which they are/will be willing to litigate in good faith,

without referring to themselves through self-manufactured pseudonyms or "attributes," without

giving incomprehensible self-generated designations to geographic locales, without reducing their

claims to "Marrakush" argot and without making facially frivolous references to the Barbary

Treaties.  If such development takes place, the so-transformed members of the Murakush Group

shall have an opportunity to litigate their claims fully and fairly.

On the other hand, until and unless members on the Murakush Group undergo such

transformation, the federal judiciary in general and this District in particular have vested interest

in minimizing these litigants' ability to abuse the legal system.

Consequently, it appears futile to factor in this final preclusion order any provision for

amendment of those pleadings, which are deficient upon receipt and indicative only on the desire

to abuse legal process.[37]

---

[37]  If Judge Simandle's extensive guidance, numerous explanations provided by the
judges in the Southern District of Florida, District of Delaware, Eastern District of Virginia and
this Court's current explanations cannot persuade the Murakush Group members to mend their
ways, there appears to be no reason to factor in this final preclusion order any allowances for
amendment of pleadings.

Another aspect appearing not warranting reflection in this final preclusion order relates to prepayment of filing fee, since it cannot be ruled out that such payments might actually be made in conjunction with initiation of new actions.  However, if so, it would be unseemly of the judiciary to allow a facially frivolous/abusive litigation on the grounds of mere receipt of $350.[38] Accordingly,

1.   in the event the Clerk receives any pro se submission, *regardless of whether it arrives accompanied by an IFP application or by a filing fee*, which:

    a.   names, as the plaintiff(s), person(s) whose name(s)/designation(s) include such words or phrases as "Marrakush" and/or "Murakush" and/or "Marankokush" and/or "Al-Maricanos" and/or "Universal Supreme Allah,"  and/or "Minister Plenipotentiary" and/or "High Priest" and/or "Noble Æmer," and/or "Divine Minister" and/or "High Priestess" and/or "Æmpress" and/or "Caliph" and/or "Aboriginal Indigenous Shaik" and/or "Shaikhess" and – *in addition* – fails to state the street/post office address of each named plaintiff (or states such address(es) via self-generated names of geographic locales), and

    b.   refers, in its body, to the Treaties;

2.   the Clerk shall:

---

[38]   In other words, if the pleadings submitted indicate the litigant's bona fide intent to litigate his/her claims, the judiciary responds by conducting a thoughtful analysis as to the litigant's ability to pay the fee or obtain IFP status.  See, e.g., Olivares v. Marshall, 59 F.3d 109 (9th Cir. 1995) (district court has discretion to require a litigant with limited financial means to make partial payment of costs of commencing action).  Conversely, if a litigant submits frivolous pleadings in brazen disregard of extensive judicial guidance provided to him/her prior, the litigant's prepayment of filing fee cannot operate as a ticket buying the litigant the amusement/ joy of abusing the federal judiciary.

a.      open a new matter and scan into the docket, as "Docket Entry No. 1," the entire

submission received, but only if the volume of such submission is equal to or less

than fifteen pages, single-sided, double-spaced, or

b.      open a new matter and scan into the docket, as "Docket Entry No. 1," only the first

three pages of the submission received, if the volume of such submission exceeds

fifteen pages, single-sided, double-spaced, and accompany such scan by the docket

text reading "SUBMISSION RECEIVED EXCEEDS THE PAGES SCANNED

INTO THE DOCKET.  HARD COPY OF THE SUBMISSION IS ON FILE WITH

THE CLERK,"

and

c.      docket the copy of this Opinion as "Docket Entry No. 2," accompanying that

docket entry with the docket text reading "OPINION DETAILING THE BASES

AND THE SCOPE OF PRECLUSION APPLIED TO THIS MATTER,

PURSUANT TO THE ORDER ENTERED IN CIVIL ACTION No. 11-1317,"

and

d.      make a new and separate docket entry, reading "PURSUANT TO THE ORDER

OF PRECLUSION ENTERED IN CIVIL ACTION No. 11-1317, THIS MATTER

IS ADMINISTRATIVELY TERMINATED.  NO FILING FEE WILL BE

ASSESSED IN CONNECTION WITH THIS ACTION.  NO AMENDED

PLEADINGS WILL BE ACCEPTED.  HOWEVER, ADMINISTRATIVE

TERMINATION IS NOT A DISMISSAL ON MERITS, AND PLAINTIFF MAY

INITIATE ANOTHER MATTER BY SUBMITTING PLEADINGS SETTING

FORTH A SHORT AND PLAIN STATEMENT SHOWING PLAINTIFF'S

ENTITLEMENT TO RELIEF ON THE BASIS OF PROVISIONS OTHER THAN

THE BARBARY TREATIES AND – IN ADDITION – STATING

PLAINTIFF(S') ACTUAL NAME, STREET AND POST OFFICE ADDRESS.

NO OTHER SUBMISSION RECEIVED WILL BE DOCKETED IN THIS

MATTER, EXCEPT FOR A NOTICE OF APPEAL NOT EXCEEDING FIVE

PAGES, SINGLE-SIDED, DOUBLE-SPACED.  IN THE EVENT ANY OTHER

SUBMISSION IS RECEIVED IN THIS MATTER, SUCH SUBMISSION WILL

NOT BE DOCKETED AND WILL BE RETURNED TO THE SENDER BY

REGULAR U.S. MAIL.  ANY NOTICE OF APPEAL EQUAL IN VOLUME TO

FIVE PAGES OR LESS WILL BE FORWARDED TO THE COURT OF

APPEALS TOGETHER WITH A COPY OF THE OPINION DOCKETED IN

CIVIL ACTION No. 11-1317," and

e.     only in the event the submission arrives accompanied by a prepayment of filing fee

in the form of a negotiable instrument that indicates an already-effectuated

withdrawal of funds (i.e., not in the form of a personal check but in the form of a

negotiable instrument akin to a cashier check, money order, etc.), deposit such

negotiable instrument and, upon obtaining the funds, remit the entire amount

received back to the sender or, if no sender's information is available or if the

sender's information is insufficient to duly effectuate such remittance, make a new

and separate entry on the docket reading, "REMITTANCE OF FILING FEE

RECEIVED CANNOT BE EFFECTUATED DUE TO LACK/INSUFFICIENCY

OF THE SENDER'S INFORMATION.  FILING FEE WILL BE REMITTED

UPON RECEIPT OF DUE PROOF OF THE SENDER'S IDENTITY.  SUCH

PROOF SHALL NOT EXCEED FIVE PAGES, SINGLE-SIDED, AND SHALL

ESTABLISH THE SENDER'S IDENTITY AS THE PAYOR OF THE FUNDS IN

THIS ACTION BEYOND ANY DOUBT.  ALL DOUBTS AS TO THE

SENDER'S IDENTITY WILL BE RESOLVED AGAINST THE SENDER," and

f.       mail, by regular U.S. mail, a copy of the docket sheet created in that matter,

together with a copy of this Opinion, to the address, if any, designated in the

submission received.

At the conclusion of this section of the Opinion, the Court takes this opportunity to

reiterate Judge Simandle's warning to the Murakush Group.  The Murakush Group litigants are

strongly urged not to test the resolve of the federal judiciary and, from this point on, avoid any

form of abusive/frivolous litigation.  The Murakush Group litigants' failure to heed to this clear

warning will result in further amplifications of the sanctions imposed herein and, if such measure

is warranted, might even result in a complete bar on their ability to initiate future legal actions.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, the Complaint at bar, Docket Entry No. 1, will be dismissed.

Such dismissal will be without prejudice to a timely submission of a *duly counseled* amended

complaint complying with the requirements of posed by the Federal Rules of Civil Procedure and

this District's Local Rules and asserting only those claims that Murakush-Amexem has standing

to pursue.

Plaintiff's motion for appointment of <u>pro</u> <u>bono</u> counsel will be denied, with prejudice, as facially frivolous.

Five limited orders of preclusion will be entered against the Murakush Group litigants. Two of these preclusion orders will address the practices of these litigants' actual or imaginary juridical entities, and the remaining three will address the practices of natural persons.

The Clerk will be directed to docket this Opinion in the Marrakush Society Cases, <u>Estate Case</u> and <u>Caliphate</u>; such docketing will be directed to be made for informational purposes only.

An appropriate Order accompanies this Opinion.


s/Robert B. Kugler
**ROBERT B. KUGLER,**
**United States District Judge**


Dated: May 13, 2011